IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,345

STATE OF KANSAS,
*Appellee*,

v.

MILO J. BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

The State's evidence that aggravated robbery may or may not have been completed by the defendant and a confederate was sufficient to give rise to the inference necessary to support jury convictions on attempted aggravated robbery and felony murder.

2.

Under K.S.A. 2014 Supp. 21-5402, felony murder is the killing of a human being committed "in the commission of, attempt to commit, or flight from any inherently dangerous felony." The phrase "in the commission of" demonstrates the legislature's intention to cover a broader spectrum of time and a defendant's activity than is covered by the concept of attempt; if a death is caused within the time and circumstances of the predicate crime's res gestae, then it qualifies as felony murder.

3.

The defendant's felony murder sentence of life imprisonment, with no possibility of parole for 20 years, was not illegal. K.S.A. 2014 Supp. 21-6819(b)(4)'s language limiting the maximum sentence in multiple conviction cases to two times the longest

sentence in a multiple conviction case applies only to on-grid crimes, not to one or more off-grid crimes charged with them.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed March 11, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: A jury convicted defendant Milo J. Brown of two alternative counts of first-degree felony murder, criminal possession of a firearm by a convicted felon, criminal discharge of a firearm, attempt to commit aggravated robbery, and aggravated burglary. On appeal, Brown argues that the evidence was insufficient to support a conviction for attempted aggravated robbery, as well as his felony-murder conviction. He also argues that the district court judge imposed an illegal sentence.

As detailed below, we affirm Brown's convictions and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

In early January 2013, Shawn Rhone was at the Wichita home of his girlfriend, LaDonta Alford. Rhone left around 5:30 or 6 p.m. after having received a phone call. Before Rhone left, he told Alford "[t]hat he was going to go make a run." Alford would testify at trial that this meant Rhone was leaving to sell someone marijuana, but she did

2

not testify on whether she actually saw marijuana in Rhone's possession before he left her home. Rhone also received a text message containing an address on Northeast Parkway in Wichita.

Just after 7 that evening, Wichita Police Officer Charles Byers reported to his dispatcher that he had heard six gunshots while patrolling just east of Northeast Parkway. Two residents living on Northeast Parkway also reported hearing gunshots.

About that time, Carl Lemons, an off-duty police officer, was arriving at his part-time job as a security guard at a nearby QuikTrip. A customer came into the store and told the clerk that a man in the parking lot had been shot. Lemons called 911 to report the shooting; Byers heard this call and drove to the QuikTrip.

When Lemons emerged from the store, he found a man lying on the ground next to a car. The car's rear window and one of its taillights had been shot out. A cell phone was lying near the victim. Lemons asked the man a series of questions, but the man had difficulty communicating. He was able to tell Lemons that he lived on "Parkway or Parkwood" and that his first name was Shawn. Investigators would later identify the man as Shawn Rhone.

After emergency medical responders arrived on the scene, Rhone was transported to Wesley Medical Center, where he later died.

Based on Rhone's statement about "Parkway" and one of the resident's reports about hearing gunshots on Northeast Parkway, officers blocked off the street and began a search for evidence. Officers found shell casings in front of 1757 Northeast Parkway.

After Rhone died, a detective went through the calls and text messages on Rhone's phone. The last received call had been placed at 6:44 the night of the shooting. There was also a text message from the same number, and it contained the 1757 Northeast Parkway address. Investigators determined that the cell phone number belonged to Euva Brown, defendant Milo J. Brown's mother.

Officers went to Euva Brown's address and spoke to her and another of her sons, Jerone. Eventually they took Euva, Jerone, and the defendant to the police station for questioning. While the defendant was getting dressed to go with the officers to the station, an officer noted that he had an electronic monitoring device on his ankle.

Defendant Milo J. Brown eventually was charged with first-degree felony murder based either on aggravated robbery of Rhone or criminal discharge of a firearm at an occupied vehicle; criminal possession of a firearm; criminal discharge of a firearm; attempted aggravated robbery; and aggravated burglary.

At trial, the State's evidence consisted primarily of Brown's connection to Rhone through the cell phone communications, ballistics evidence, tracking information from Brown's GPS tracker, and the testimony of one of Brown's acquaintances from jail.

The State's firearm expert testified that he had tested several bullets found during the investigation: a bullet taken from Rhone's body, one found in the QuikTrip parking lot, another found on the front floorboard of Rhone's car, another found in the rear dash of Rhone's car, and another found near the right rear door of Rhone's car. The expert concluded that the bullet found in the QuikTrip parking lot and the one found on the front floorboard of Rhone's car had been fired from the same gun and that the entire collection of five bullets had been fired by at least two different guns.

Terrell Vernor of Sentinel Vendor Services testified and explained a video depicting defendant Milo J. Brown's location throughout the day of Rhone's murder, based on information generated by the GPS monitoring bracelet. According to Vernor, at 6:44 p.m., Brown was near 4265 East 13th Street North and was moving at a speed that indicated he probably was traveling in a vehicle. By 6:51 p.m., Brown was traveling, possibly in a vehicle, on Northeast Parkway near a house with the number 1779. Between 6:51 p.m. and 7:07 p.m., the GPS monitor placed Milo J. Brown in front of 1779 Northeast Parkway, by showing "basically a cluster of points." At 7:08 p.m., the monitor indicated Brown had started to move again and was heading westbound on East 21st Street toward southbound I-135. According to Vernor, although the GPS monitoring system itself returned relatively accurate latitude and longitude data, the way that mapping software applied the information could result in an address given being off by up to 30 meters.

The State's jailhouse witness, Cameron Porter, met Milo J. Brown while Brown was in jail, awaiting trial of this case. At the conclusion of a jail chapel service, Porter and Brown had a conversation in which Brown told Porter that he was in jail with his two brothers and Myron Peterson because of the QuikTrip homicide. Brown then told Porter the details of Rhone's shooting, saying he and his brothers and Peterson had set up a meeting with Rhone with the intention of robbing him of drugs. Porter testified that Peterson initiated the meeting by calling Rhone on Brown's cell phone. At the arranged meeting place,

"[Brown] got in the car and started conversating [*sic*] with the fellow. And while conversating [*sic*] with the guy [Peterson] walked—walked to the other side of the car, to the driver's side, and also started initiating communication with the victim. And while [Peterson] was communicating with him and then I guess words was exchanged, and so that's when [Brown] had said he jumped out the car, out of the vehicle, And they both, I guess had drawn a weapon at that point. So those was the circumstances right then.

5

"And what was said, there was still communication going back and forth between [Peterson] and the other guy. And then I guess that's when [Brown] said, 'why we playing? If we're going to shoot him, why would we play about?' And at—from that—from them further words, that's when [Brown] had said they shot."

Porter reiterated that when Brown had said "they" shot, Brown had meant "both shot. Not intentionally saying who shot first, but saying that they shot."

Porter then testified about Brown's conversation with Rhone while in Rhone's car:

"Going on about 'Do you have—you have—you have the stuff for us,' pretty much. I don't know exactly what they was getting or anything, but the drugs. They was asking, 'Do you have drugs?' And I guess the guy was asking, 'Do you have money? Show me the money first.' And I guess that's when [Brown] had pulled out the money, showing him the money, to flash him the money to, you know, 'Okay. It's here.' But, you know, and so then—then that's when [Brown] asked the guy to show him what—show him his stuff. I guess the guy was fidgeting, being nervous, nervous about the whole situation. Then that's—around that time, that's when [Peterson] had walked around the vehicle to the driver's side, to the victim's window—or door, as you should say. And that's why—just saying, 'Show us the work,' or whatever, 'or we will shoot. We will shoot you, man. Stop playing or we going to shoot you.' And I believe—I don't remember, but I believe that those was the words that [Brown] had said that [Peterson] told—said to—said to the victim."

After Porter's description of the robbery and subsequent shooting, the State asked Porter about what had happened to the drugs:

"Q. Was there ever a discussion as to whether or not they actually got the drugs?

"A. No.

6

"Q. So you don't know whether he got the drugs or not?

"A. No, I do not know."

Later, during the testimony of Detective Rick Craig, the State asked whether investigators had been able to find out what happened to the drugs:

"Q. When the victim, Shawn Rhone, when his vehicle was searched, and I guess when his person was searched, at any point in time did they ever find any marijuana on him?

"A. No, there was none found.

"Q. Okay. And you talked to Cameron Porter?

"A. Yes.

"Q. And he indicated to you that the defendant didn't indicate to him whether or not they got the marijuana?

"A. Correct.

"Q. Did you have any evidence to say one way or the other that the marijuana was actually taken?

"A. No. Even before we talked to Cameron Porter, officers went back and walked the area between the Quiktrip and 1757 Northeast Parkway to see if maybe it was thrown out of the vehicle and none was located.

"Q. Possible it just wasn't found?

"A. It's possible.

7

"Q. The bottom line is, the Wichita Police Department doesn't know what happened to the marijuana?

"A. That's true."

At the conclusion of the evidence at trial, the jury was instructed on the elements of the charged crimes. The district judge gave the following instruction for first-degree felony murder with the underlying felony of aggravated robbery or attempted aggravated robbery:

"The defendant is charged in Count 1 with the crime of first-degree felony murder. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"1. That the defendant or another killed Shawn F. Rhone;

"2. The killing was done while committing or attempting to commit aggravated robbery; and

"3. This act occurred on or about the 2nd day of January, 2013, in Sedgwick County, Kansas.

"The elements of aggravated robbery as applicable here are set out in an instruction that will follow[.]"

The attempted aggravated robbery instruction provided:

"The defendant is charged in Count 5 with an attempt to commit aggravated robbery. He pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant performed an overt act toward the commission of aggravated robbery;

"2. The defendant did so with the intent to commit aggravated robbery;

"3. The defendant failed to complete commission of the aggravated robbery; and

"4. This act occurred on or about the 2nd day of January, 2013, in Sedgwick County, Kansas.

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The elements of the completed crime of aggravated robbery are as follows:

"1. The defendant knowingly took property from the presence of Shawn Rhone;

"2. The taking was by threat of bodily harm to Shawn Rhone;

"3. The defendant was armed with a dangerous weapon; and

"4. This act occurred on or about the 2nd day of January, 2013, in Sedgwick County, Kansas."

After deliberation, the jury returned guilty verdicts on all charges. At sentencing, the district judge imposed a hard 20 life sentence for the off-grid first-degree felony-murder conviction. For the on-grid crimes, the district judge imposed a consecutive 60-

9

month prison sentence for the aggravated burglary and concurrent sentences for the remaining three convictions.

SUFFICIENCY OF THE EVIDENCE

The defendant argues on this appeal that the evidence to support his conviction for attempted aggravated robbery was insufficient, making the evidence supporting his conviction for felony murder insufficient. In his view, because investigators did not recover the drugs that were the target of the aggravated robbery, the State could not show that he failed to complete the robbery.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014)." *State v. Woods*, 301 Kan. 852, 874, 348 P.3d 583 (2015).

In Kansas, an attempt requires proof of three elements:  the defendant's commission of any overt act toward the perpetration of a crime, the defendant's intention to commit the crime, and the defendant's failure to complete the crime. K.S.A. 2014 Supp. 21-5301; see also *State v. Hernandez*, 294 Kan. 200, Syl. ¶ 1, 273 P.3d 774 (2012) (failure to complete commission of crime element of attempt); *cf. United States v. Resendiz-Ponce*, 549 U.S. 102, 106, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007) (common law attempt required intent to commit completed offense, "some open deed tending to the execution of defendant's intent"). In order to convict, "the State must prove each required element of the charged crime beyond a reasonable doubt." *State v. Miller*, 298 Kan. 921, Syl. ¶ 5, 318 P.3d 155 (2014).

10

We addressed a challenge similar to the one in this case in *State v.* [*Keaira*] *Brown*, 300 Kan. 542, 331 P.3d 781 (2014).

In the *Brown* case, defendant Keaira Brown was found guilty of first-degree felony murder and attempted aggravated robbery. 300 Kan. at 545. On appeal, the defendant challenged the sufficiency of the evidence supporting her conviction for attempted aggravated robbery, specifically the evidence to establish that her robbery attempt had failed. We summarized the defendant's contention in the following words: "[T]here was no evidence of an attempted taking, only a completed one." 300 Kan. at 556. The State had alleged that the defendant attempted to steal the victim's car and that the attempt coincided with the defendant's fatal shooting of the victim.

Keaira Brown argued that, as a matter of law, the taking of the victim's car was complete the instant she shot the victim because the victim had been incapacitated at that point and thus the defendant had "'complete, independent, and absolute possession and control'" over the car. 300 Kan. at 557 (quoting *State v. Valdez*, 266 Kan. 774, 786, 977 P.2d 242 [1999]).

We rejected Keaira Brown's argument, concluding that the evidence before her jury was sufficient to support a finding that the aggravated robbery was never completed. 300 Kan. at 557-58. We wrote:

> "One witness testified she heard an argument during the incident. And in the process of rolling to its final stopping place, the vehicle struck a fire hydrant on one side of the road and a light pole on the other. Another witness saw Brown abandon the vehicle immediately after it crashed. [The victim's] body was found with the torso lying on the driver's seat. From this evidence, a reasonable factfinder could conclude Brown failed to complete the taking of [the victim's] vehicle because [the victim's] resistance or his

11

body's position after the shooting prevented her from obtaining possession of and control over the car." 300 Kan. at 557-58.

We are led inevitably to the same conclusion in this case.

Although a reasonable factfinder could have found from the evidence that defendant Milo J. Brown and Peterson succeeded in obtaining the drugs from Rhone, when we view the evidence in the light most favorable to the State, as we are required to do on an insufficiency challenge, see *State v. Keel*, 302 Kan. 560, 566, 357 P.3d 251 (2015), a reasonable factfinder also could have concluded that the aggravated robbery was unsuccessful.

The evidence established that Rhone was with his girlfriend until he received a phone call to set up the sale of marijuana. According to Porter's recitation of Brown's jailhouse story about what happened on Northeast Parkway, after Brown and Peterson met with Rhone with the intention of robbing him of the drugs rather than paying for them, Rhone was reluctant to show them "the stuff." Despite several requests, he "was fidgeting, being nervous, nervous about the whole situation." Rhone's hesitation was met with the gunshots that killed him.

Investigators found no drugs on Rhone's person or in his car or between the scene of the shots on Northeast Parkway and the QuikTrip or in Brown's possession when he was taken to the police station from his mother's home. Logically, this could mean one of only four things: (1) Rhone did not have drugs in his possession when he met Brown and Peterson on Northeast Parkway, which is consistent with his reluctance to show "the stuff" to Brown and Peterson; (2) Brown and Peterson completed the aggravated robbery by taking the drugs from Rhone before they shot him and he drove away from the Northeast Parkway scene; (3) Rhone managed to dispose of the drugs after being shot on

12

Northeast Parkway and before reaching the QuikTrip, in a place the police did not later discover; (4) some other person found and took possession of the drugs Rhone disposed of between Northeast Parkway and the QuikTrip before police had a chance to conduct their search.

Three of these four scenarios, any of which could be inferred from the evidence presented at Brown's trial, could have led a reasonable factfinder to conclude that Brown was guilty of attempted aggravated robbery. Thus the evidence of attempted aggravated robbery, and any felony murder predicated upon it, was sufficient.

Brown's extension of his sufficiency argument to attack his felony-murder conviction fails for a second reason as well. He was originally charged with felony murder with the completed aggravated robbery as the predicate felony. The jury was instructed on the completed crime as well as the attempted crime.

Felony murder is the killing of a human being committed "*in the commission of*, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2014 Supp. 21-5402. Under the defining statute, the phrase "in the commission of" demonstrates the legislature's intention to cover a broader spectrum of time and a defendant's activity than is covered by the concept of attempt; if a death is caused within the time and circumstances of the predicate crime's res gestae, then it qualifies as felony murder. See *State v. Cheffen*, 297 Kan. 689, Syl. ¶ 6, 303 P.3d 1261 (2013) ("phrase 'in the commission of, attempt to commit, or flight from' describes factual circumstances sufficient to establish *a* material element of felony murder"; phrase does not create alternative means [emphasis added]).

13

"In *State v. Cameron,* 300 Kan. 384, 396-97, 329 P.3d 1158 (2014), we stated:

"'In order to establish felony murder, the State must prove two causation elements. First, the death must lie within the res gestae of the underlying crime, which is defined in this context as acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence. Second, the felony and the homicide must have a direct causal connection, which exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.'

"Furthermore, in *Jacques* [270 Kan. 173, 14 P.3d 409 (2000)], we stated:

"'When applying the felony-murder rule . . . the felony and the victim's death do not need to occur simultaneously, nor does the felony need to occur before the death. Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and therefore subject to the felony-murder rule.' 270 Kan. at 189-90.

"Regarding the causal connection between an attempted aggravated robbery and a subsequent death, this court in *State v. Branch and Bussey,* 223 Kan. 381, 383, 573 P.2d 1041 (1978), stated:

"'A felon's attempt to commit a robbery sets in motion a chain of events which should cause him to contemplate that a death might occur. This is particularly true of a robber who carries a deadly weapon . . . and forces his way into an occupied dwelling. The impulse for an individual to resist the sudden show of force, to defend himself or to come to the aid of a family member or loved one, is a basic human instinct. Under such circumstances every robber who expects human opposition to his quest to steal, as he must when he commits a statutory robbery, is a potential

14

assassin because he knows he may be forced to use his weapon either to carry out his criminal act or to escape without being pursued and captured by his victim.'" *State v. McClelland*, 301 Kan. 815, 822, 347 P.3d 211 (2015).

Brown does not dispute that he had the intention to carry out the aggravated robbery or that he committed an overt act toward its completion. He also does not dispute that Rhone was killed in the process. Under such circumstances, Rhone's killing was clearly within the res gestae, *i.e.*, during "the commission of" the intended aggravated robbery, whether completed or foiled. See K.S.A. 21-5402(a)(2).

ILLEGAL SENTENCE

Brown also argues that the district judge imposed an illegal sentence by giving him a total term longer than twice his base sentence. Brown bases this argument on the language of K.S.A. 2014 Supp. 21-6819(b)(4), which limits "[t]he total prison sentence imposed" in multiple conviction cases to "twice the base sentence." See *State v. Bolin*, 266 Kan. 18, 19, 968 P.2d 1104 (1998) ("A multiple conviction case is a case involving multiple crimes arising under a single charging document."); see also *State v. Donaldson*, 302 Kan. 731, 733, 355 P.3d 689 (2015) (illegal sentence includes sentence that fails to conform to applicable statute).

This appellate challenge requires statutory interpretation, and we review such questions de novo. *State v. Williams*, 299 Kan. 870, 872, 326 P.3d 1070 (2014).

The district judge imposed a life sentence without the possibility of parole for 20 years for Brown's conviction of the off-grid felony murder. In addition, using Brown's aggravated burglary conviction as the "primary crime" under K.S.A. 2014 Supp. 21-

15

6819(b)(4), the district judge imposed a 60-month sentence for Brown's conviction of aggravated burglary to run consecutive to Brown's life sentence. The district judge ordered the sentences for the three remaining convictions to run concurrent to Brown's sentence for the primary crime.

In multiple conviction cases under K.S.A. 2014 Supp. 21-6819, a district judge generally has discretion to impose consecutive or concurrent sentences; express exceptions apply for certain mandatory consecutive sentences. K.S.A. 2014 Supp. 21-6819(b). If a judge chooses to impose consecutive sentences, he or she "shall establish a base sentence for the primary crime," and the "primary crime" is defined as "the crime with the highest crime severity ranking." K.S.A. 2014 Supp. 21-6819(b)(2).

The statute also explicitly contemplates situations in which an off-grid crime is prosecuted with one or more on-grid crimes, preventing the off-grid crime from being used as the "primary crime." K.S.A. 2014 Supp. 21-6819(b)(2). The statute also covers the order in which consecutive off-grid and on-grid sentences are served, providing that "[i]f sentences for off-grid and on-grid convictions are ordered to run consecutively, the offender shall not begin to serve the on-grid sentence until paroled from the off-grid sentence, and the postrelease supervision term will be based on the off-grid crime." K.S.A. 2014 Supp. 21-6819(b)(2).

Brown urges us to interpret the additional language in K.S.A. 2014 Supp. 21-6819(b)(4) limiting "[t]he total prison sentence imposed" to "twice the base sentence" to mean that he cannot legally receive a life sentence for felony murder. He seeks a ruling that the total length of the sentence in any case in which the State has obtained on-grid and off-grid convictions cannot exceed twice the longest on-grid sentence.

Brown's argument ignores the fact that we do not interpret statutes in isolation. Rather, we attempt to harmonize all the parts of an act to the greatest extent possible. See *State v. Hobbs*, 301 Kan. 203, 210-11, 340 P.3d 1179 (2015) (court considers provisions of an act *in pari materia* with view to reconciling, bringing provisions into workable harmony).

Brown's suggested interpretation would eliminate mandatory life sentences assigned by the legislature for off-grid crimes, if they happen to be charged with on-grid crimes. K.S.A. 2014 Supp. 21-6806(c) provides that the sentence for off-grid crimes "shall be imprisonment for life and shall not be subject to statutory provisions for suspended sentence, community service or probation." K.S.A. 2014 Supp. 22-3717(b)(3) governing parole eligibility for prisoners serving life terms not covered by other mandatory minimums, see K.S.A. 2014 Supp. 21-6620; K.S.A. 2014 Supp. 21-6623, requires an inmate to serve 20 years before being released. These are the statutes that speak directly to the required length of Brown's felony-murder sentence, and they control. The K.S.A. 2014 Supp. 21-6819(b)(4) language on which he seeks to rely refers only to the total maximum sentence received for multiple on-grid crimes in one case. See *McClelland*, 301 Kan. at 831 (defendant's base sentence for primary crime 57 months; therefore "total prison sentence for his *on-grid* crimes could not exceed 114 months"). Brown's sentence was not illegal.

CONCLUSION

The State produced sufficient evidence to support Brown's convictions for attempted aggravated robbery and felony murder. Brown's sentence was not illegal. We therefore affirm the judgment of the district court.