NOT DESIGNATED FOR PUBLICATION

No. 114,238

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

HECTOR A. AMARO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Seward District Court; CLINT B. PETERSON, judge. Opinion filed May 5, 2017. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Paul F. Kitzke*, special prosecutor, of Hugoton, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., PIERRON and BRUNS, JJ.

*Per Curiam*: Hector A. Amaro appeals after a jury convicted him of aggravated kidnapping, aggravated battery, aggravated intimidation of a witness, and criminal threat. On appeal, Amaro contends that one of the jury instructions given by the district court was clearly erroneous, that the prosecutor committed reversible error during arguments to the jury, that there was insufficient evidence to support his aggravated intimidation of a witness conviction, and that cumulative errors denied him a fair trial. We find that none of these contentions rises to the level of reversible error. Likewise, we find that Amaro received a fair trial. Thus, we affirm his convictions.

1

On the evening of April 28, 2014, Julio Ruiz was visiting Adrian Molina at his house. Miguel Mariscal was also present. While Ruiz and Molina were in the living room, five members of the Sureño gang arrived at the house. Molina spoke to the men in the kitchen. Eventually, Molina informed Ruiz that the men were talking about "jumping" him and that he should leave. Ruiz believed that the men were there to beat him up because he was considered a "snitch" after he testified against a codefendant at a preliminary hearing in a robbery case.

Ruiz went outside and the group of men followed. Before Ruiz could get away, the men told him that they needed to talk to him inside. Once inside the house, the five men confronted Ruiz and accused him of being a snitch. According to Ruiz, a man who the others called "Animal" put his hand on Ruiz' chest and said they should go outside to talk. The man called "Animal" was later identified to be Amaro. As Ruiz began to open the door, Amaro hit him in the side of the head. The other men jumped in and also began hitting Ruiz. As a result of the beating, Ruiz' face became bloodied.

Ruiz was allowed to go to the bathroom to wash the blood off his face. Although Ruiz thought about attempting to escape from the bathroom window, he did not think he could open the window without the men hearing him. When he came out of the bathroom, the men cornered him in the kitchen and again began to accuse him of being a snitch. Once again, Amaro and the other men began beating him. The men beat Ruiz with a chair, knocking him to the floor, and began kicking him in the head. They then made Ruiz take off his shirt and use it to clean up his blood from the floor.

The men then placed Ruiz in a chair facing the corner of the kitchen. Amaro told him that if he ever told anyone what happened, the results would be 10 times worse. Amaro also indicated that he might prevent Ruiz from leaving the house permanently and

said that there was plenty of room left in the fields. Ruiz later indicated that he believed that Amaro was threatening his life.

The men began to beat Ruiz for a third time. After knocking him to the ground, the men broke a chair over him. One of the men then began to repeatedly thrust a broken chair leg into Ruiz' face. Amaro also repeatedly slapped Ruiz in the face with the wire handle of a flyswatter. Several of the men began to say that Ruiz had been beaten enough and asked Amaro to stop. Molina also tried to stop the beating but Amaro threatened him and made him punch Ruiz. Ruiz later testified that he was too scared to move and that he felt that he was not able to leave the house.

After 1 1/2 to 2 hours, the men left the house saying that the party was over. After waiting to make sure that the men had actually left, Mariscal took Ruiz to his uncle's house. Because Ruiz could not stop the bleeding, he went to the emergency room. At the hospital, Ruiz received six stitches on the back of his head. Neither Ruiz nor the hospital reported the incident to law enforcement.

Several weeks later, Ruiz was involved in another altercation. Evidently, Ruiz was at the home of a woman who was in the process of a divorce when her husband arrived to pick up the couple's daughter. When the man saw Ruiz, he began hitting him with a pipe. Ruiz knocked the pipe out of the man's hand and jumped out a window. Someone saw Ruiz jump out the window and called the police.

When officers interviewed Ruiz about the incident, he mentioned that he was glad the man did not hit him in the head with the pipe because he had stitches that he did not want to break open. The officers asked him what happened, and he told them he had been beaten up. The officers then sent Ruiz to talk to a detective. Eventually, Ruiz was shown photographs by law enforcement and identified Amaro as the person who the other men who had beaten him up called "Animal" during the incident at Molina's house in April.

3

On June 9, 2014, the State charged Amaro with aggravated kidnapping, conspiracy to commit aggravated kidnapping, aggravated battery, aggravated intimidation of a witness, and criminal threat. The complaint was subsequently amended but the charges remained the same. We note that at one point there was evidently a riot charge brought against Amaro but it appears that it was never presented to the jury. Ultimately, the district court held a 2-day jury trial on February 23 and 24, 2015.

At trial, the State called Mariscal to testify that Amaro was the man the others called "Animal" on the night that Ruiz was beaten. He also testified that he knew the other four men involved in the attack by their nicknames—Kilo, Casper, Temper, and Pelon. Mariscal then testified about the events that occurred at Molina's house on April 28, 2014. According to Mariscal, he went into the kitchen and saw the five gang members—including Amaro—beating up Ruiz. He testified that he told them to stop once or twice, but they told him they would beat him up as well if he backed up Ruiz. He then went into the living room while the beating took place for the next 1 1/2 to 2 hours. Mariscal testified that he was scared and thought the men were going to kill Ruiz. When the men finally left, Mariscal saw that Ruiz' face was swollen and bloody.

The State then called Ruiz, who testified that on the evening of April 28, 2014, he drank two or three beers. In addition, he also admitted that had taken an ecstasy pill that evening as well. However, Ruiz indicated that he could recall the events of the evening clearly. Ruiz testified that at the time this incident occurred, he was on probation for conspiracy to commit robbery and that it was a violation of his probation to drink alcohol or use drugs. Ruiz testified that he had agreed in the earlier case to testify against his coconspirator in exchange for probation. He also testified that the State had not made him any promises in exchange for his testimony in the present case.

Describing the events of April 28, 2014, Ruiz testified that although he did not know Amaro, he was the person the other men called "Animal" that evening. He stated

4

that Amaro and the other men were affiliated with the Sureño or "South Side" gang. He testified that he was never a gang member, but he has friends who are or have been affiliated with Sureño gangs. According to Ruiz, he was sitting in the living room when the gang members came into Molina's house. About 10 minutes after they arrived, Molina came into the living room and sat next to Ruiz on the couch. Molina told Ruiz not to look at him but that the men were "talking about jumping [Ruiz] and [he] needed to get out of there." Ruiz thought the men were there because they considered him to be a "snitch" for testifying at the preliminary hearing against his coconspirator in the robbery case.

Ruiz testified that he got up and asked Molina to come outside to smoke a cigarette with him. Once outside, Ruiz made it about 15 feet from the house when the five men came out and told him that they wanted to talk to him inside. Ruiz indicated that he then went back inside the house. Once inside the kitchen, the man called Amaro began questioning him and accusing him of being a snitch. Amaro then put his hand over Ruiz' heart and asked him why his heart was beating so fast. Ruiz answered it was because there were a bunch of people standing around asking him if he was a snitch.

Amaro then asked Ruiz if he would go outside in the back and talk with him. According to Ruiz, Amaro took off his shirt, took a 12-inch knife from his waistband, and handed the shirt and knife to one of the other men. As Ruiz opened the back door, Amaro struck him in the side of his head. After Amaro hit Ruiz a couple of times, the other men also began hitting him. Because he was bleeding, Amaro told Ruiz to go clean off his face in the bathroom.

When Ruiz went back into the kitchen, Amaro and one of the men continued questioning him about being a snitch. The other men were all standing around the table, and then they all began hitting him again with their fists. At one point, they hit him over the head with one of the kitchen chairs and he fell to the floor. The men then repeatedly

5

stomped on Ruiz and kicked him in the head. Amaro then told Ruiz to clean up his blood from the floor with his shirt.

After he had cleaned up the blood, one of the men with Amaro stated that they should let him go since he had already been beaten badly enough and had cleaned up. At some point during the attack, Molina also told them they should stop. In response to these comments, Amaro told them that there was no mercy and asked whether they were trying to have Ruiz' back against his. Ruiz testified that although the other men were participating in the beating, Amaro was the leader of the group.

The men then placed Ruiz in a chair in the corner of the room. Again, Amaro began questioning him. At one point, Amaro told Ruiz not to look at him, and the chair was turned so that Ruiz was facing the wall. The men eventually pulled Ruiz off the chair and began beating him again. This time he was hit with a chair so hard that it broke. After that, the men passed around one of the chair legs and used it to hit Ruiz. Amaro told Ruiz to stop blocking his face or "it's going to be worse." Ruiz testified that while they were hitting him with the chair leg, he feared for his life. He also testified that he did not feel that he was free to leave.

Ruiz testified that the men put him back on a different chair. At that point, Amaro began talking to one of the other men about whether Ruiz should be allowed to leave. Amaro told Ruiz that if he "told on" him, it was going to be 10 times worse. Amaro also said "there was plenty of room in the fields." Ruiz believed that this meant Amaro would kill him.

Eventually, Amaro told Ruiz to turn around and face him. Amaro then told Molina to punch Ruiz in the face. At some point, Amaro began hitting Ruiz in the face with the wire handle of a flyswatter. Ruiz testified that after the beatings were over, Amaro told

6

him not to tell on them because he knew where he lived. Ruiz testified that the men were at the house for quite a while—possibly between 2 to 3 hours.

In addition, Ruiz testified that he went to his uncle's house after the attack and took a shower. However, he ended up going to the emergency room because his head would not stop bleeding. Ruiz received treatment, including six stitches in the back of his head. Ruiz told the hospital personnel that some people that picked him up while he was walking on the side of the street beat him up. He also told them that they had been forced to drink alcohol.

On cross-examination, Ruiz admitted that he initially lied to investigators and told them that he was "jumped" in the street while walking home from his uncle's house, which was the same story he had told at the hospital. He also had told his probation officer that he had been attacked while walking on the street. Ruiz testified that he willingly went back into Molina's house with the men on the night he was beaten. He testified there was a window in the bathroom where he went to clean up after the first attack. However, he thought the window was jammed and that he could not open it without the men hearing him. In addition, he testified that although no one told him he could not leave, he was afraid to leave. In addition to drinking and taking drugs, Ruiz was also violating his probation by being out past the 10 p.m. curfew on April 28, 2014.

On the second day of trial, the State called Detective Josh Olson to testify regarding his interview of Amaro on June 6, 2014. After being informed of his *Miranda* rights, Amaro admitted to Detective Olson that people referred to him as "Animal." Detective Olson also testified that Amaro was a member of the Sureño gang. During the interview, Amaro also told Detective Olson that he was the "shot caller" or "shock collar," which Detective Olson interpreted to mean that Amaro was a leader who made the rules. Although Amaro told Detective Olson that he was no longer associated with the gang, it was discovered during his investigation that was not true. Amaro also admitted to

7

Detective Olson that he beats up people who snitch on a gang member. However, he denied any involvement in beating up Ruiz. Amaro then told Detective Olson that when he figured out who the witnesses were against him, he would "handle them his way" or "take care of them."

On cross-examination, Detective Olson testified that Amaro told him that he was working and trying to set his life straight. Detective Olson also testified that Amaro indicated that he did not want to be called by the nickname "Animal" anymore. Also, Amaro allowed Detective Olson to look through his phone and answered questions about his contacts listed in the phone.

After the State rested, Amaro moved to dismiss the two kidnapping charges and requested a directed verdict on all of the charges. The district court denied the motions, and the defense recalled Detective Olson to testify. Amaro's attorney then pointed out some inconsistencies between the Detective Olson's report and Ruiz' trial testimony.

The defense also called Japeth Kerr, a former detective for the Liberal Police Department, who testified that he went to Ruiz' home to speak to him in June 2014. During this interview, Ruiz told Detective Kerr that the incident occurred on May 5 instead of April 28. He also told Detective Kerr that the men picked him up off the street, pulled his shirt over his head, and took him somewhere before dropping him back on the street. Ruiz told Detective Kerr that he had hit one of the people so hard it knocked that person down. On cross-examination, Detective Kerr testified that during the interview, Ruiz had identified Amaro through a photographic lineup.

After Detective Kerr's testimony, the defense rested and no rebuttal evidence was presented. The parties then discussed the jury instructions outside of the jury's presence. The record reflects that neither party objected to the proposed jury instructions or to the

8

proposed verdict form. The district court then instructed the jury and closing arguments were presented by counsel.

After deliberation, the jury found Amaro guilty of aggravated kidnapping, aggravated battery, aggravated intimidation of a witness, and criminal threat. However, the jury found Amaro not guilty of conspiracy to commit aggravated kidnapping. On May 6, 2015, the district court sentenced Amaro to 240 months of imprisonment. Thereafter, Amaro timely filed a notice of appeal.

ANALYSIS

*Mental Culpability Instruction*

Amaro contends that the instruction given to the jury defining the terms knowingly and intentionally was clearly erroneous. In response, the State contends that the instruction was not clearly erroneous because it properly defined these terms and points out that the elements instruction for each of the crimes charged stated the correct mental culpability that must be proven for the particular crime. Moreover, the State contends that regardless of this instruction, the outcome of the trial would have been the same.

Because Amaro did not object at trial to the instruction he now complains about, we can only reverse if the instruction was clearly erroneous. See K.S.A. 2016 Supp. 22-3414(3). To determine whether a jury instruction is clearly erroneous, we use a two-step process. First, we must consider whether there was any error at all by considering whether the instruction was both legally and factually appropriate, employing an unlimited review of the entire record. Second, if we find error, we must assess whether we are firmly convinced that the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014).

9

Specifically, Amaro argues that the following jury instruction was clearly erroneous:

> "The State must prove the defendant acted knowingly or intentionally when he committed the acts that lead to the charged crimes.

> "A defendant acts knowingly when the defendant is aware that conduct was reasonably certain to cause the result complained about by the State.

> "The defendant may have also acted intentionally when he committed the acts that lead to the charged crimes. If you find that the defendant acted either [*sic*] intentionally that is sufficient to establish the charged crimes.

> "A defendant acts intentionally when it is the defendant's desire or conscious objective to commit the act complained about by the State."

The challenged instruction appears to combine language from PIK Crim. 4th 52.010 and 52.020. In turn, these instructions are based on K.S.A. 2016 Supp. 21-5202(h) and (i), which contain the definitions for *intentionally* and *knowingly* to be used in criminal cases. Additionally, K.S.A. 2016 Supp. 21-5202(c) states:

> "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally."

PIK Crim. 4th 52.010 states in relevant part:

> "The State must prove that the defendant (committed the crime) (*insert defendant's act that is the element of the crime which requires a particular culpable mental state) insert one of the following*:

- intentionally.

  or

- knowingly.

  or

- recklessly.

"[A defendant acts intentionally when it is the defendant's desire or conscious objective to *insert one or more of the following as appropriate for the crime charged:*

- do the act complained about by the State.

. . . .]

"[A defendant acts knowingly when the defendant is *aware insert one or more of the following as appropriate for the crime charged*:

. . . .

- that (his)(her) conduct was reasonably certain to cause the result complained about by the State.]"

PIK Crim. 4th 52.020 states in relevant part: "If the State has proved that the defendant acted intentionally, then the State has proved as well that the defendant acted knowingly."

Our Supreme Court "strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015). Of course, combining more than one instruction could possibly lead to confusion. Thus, it is a better practice not to do so.

11

Nevertheless, Amaro does not argue that the mental culpability instruction given by the district court to the jury in his case contains improper definitions. Nor does he argue that the instruction was factually inappropriate. Instead, he argues that the wording of the instruction "indicates that either culpability level is sufficient, and indicates that it applies to all of the charged crimes." On the other hand, the State argues that this instruction did not tell the jury it could find Amaro guilty if it found he acted either knowingly or intentionally on each of the charges.

It is important to recognize that the district court included the specific mental culpability required in the elements instruction for each charge. Specifically, regarding aggravated kidnapping, the jury was instructed that the State must prove that Amaro had "the *intent* to hold Julio Ruiz to inflict bodily injury on or to terrorize Julio Ruiz." (Emphasis added.) Moreover, regarding aggravated battery, the jury was instructed that the State must prove that Amaro "*knowingly* caused physical contact with Julio Ruiz in a rude, insulting or angry manner in any manner whereby great bodily harm, disfigurement or death can be inflicted." (Emphasis added.) Similarly, the lesser included offense battery instruction stated that the State must prove that Amaro "*knowingly* caused bodily harm to Julio Ruiz." (Emphasis added.) In addition, the instruction for aggravated intimidation of a witness stated that the State must prove that "[t]his act was done with the *intent* to vex, annoy, harm or injure Julio Ruiz." (Emphasis added.) Also, the instruction for criminal threat stated that the State must prove that Amaro "threatened to commit violence and communicated the threat with the *intent* to place another in fear."

In yet another jury instruction, the district court informed the jury of the following:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

We must examine jury instructions as a whole, without focusing on any single instruction, in order to determine whether the instructions properly and fairly state the applicable law or whether it is reasonable to conclude that the instructions could have misled the jury. *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014). We agree that the jury instruction in question could have been worded more clearly by separating it into two instructions as suggested by the PIK Criminal Committee or by stating in the first sentence: "The State must prove the defendant acted knowingly or intentionally, *depending on the specific charge*, when he committed the acts that lead to the charge crime." Regardless, based on our review of the jury instructions as a whole, we do not find the mental culpability instruction to be clearly erroneous.

Finally, even if we found that the mental culpability instruction to be legally inappropriate, such an error would not be reversible because we are firmly convinced that the jury would not have reached a different result even if the instruction had been worded more clearly. See *State v. Brown*, 300 Kan. 542, 555, 331 P.3d 781 (2014). This is particularly true because the individual element instructions clearly set out what the State was required to prove in order to convict Amaro of each charge. Accordingly, we do not find that the jury was misled.

*Prosecutorial Error*

Amaro also contends that the prosecutor committed reversible error based on several things he said during the trial. Specifically, he argues that the prosecutor misstated the evidence as well as the law. In addition, he points to the fact that the prosecutor referred to him by the nickname "Animal" on several occasions. In response, the State argues that although the prosecutor misspoke regarding attribution of evidence and did refer to Amaro by his nickname, these things did not rise to the level of prosecutorial error. Further, the State argues that even if we determine that the prosecutor committed error, any such error was harmless.

The Kansas Supreme Court established a new framework for reviewing prosecutors' behavior in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), which it decided on September 9, 2016. In adopting this new framework, our Supreme Court overruled portions of the former prosecutorial misconduct standard set forth in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004). See *State v. Kleypas*, 305 Kan. 224, 314, 382 P.3d 373 (2016). Here, Amaro filed his appellate brief on August 1, 2016, before *Sherman* was decided, so he argued prosecutorial misconduct under the former standard. The State, however, filed its brief after the *Sherman* decision and applied its reasoning to Amaro's claims of prosecutorial misconduct/error. Regardless, the result in this case would be the same under either framework.

Based on our review of the record on appeal, we do not find that the statements made by the prosecutor at trial were outside the wide latitude that prosecutors are allowed in discussing the evidence. This analysis is the same under both the old and new frameworks. See *Kleypas*, 305 Kan. at 316. Even if we found the statements made by the prosecutor to constitute error, we do not find that they resulted in prejudice nor do we find that Armao was denied a fair trial. In making this determination, we did not find the alleged prosecutorial error to be gross and flagrant or to be motivated by prosecutorial ill will. Furthermore, we find the evidence presented at trial to be of a direct and overwhelming nature so that the alleged error would likely have had little weight in the minds of jurors in reaching their verdict. See 305 Kan. at 314-16.

A claim of prosecutorial misconduct/error based on nonevidentiary comments made during voir dire, opening statements, or closing arguments will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012). But a contemporaneous objection must be made to all evidentiary claims—including questions posed by a prosecutor and responses to those questions—to preserve the issue for appellate review. *State v. Raskie*,

14

293 Kan. 906, 914, 269 P.3d 1268 (2012). Thus, we only consider the statements Amaro complains about that were made during opening statements or closing arguments.

Amaro complains about the prosecutor using his nickname of "Animal" two times during the opening statements and two times during closing argument. However, a review of the record reveals that the vast majority of the time, the prosecutor referred to him not as "Animal" but as "Hector Amaro" or "Mr. Amaro." Certainly, a prosecutor "has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and 'must guard against appeals to jurors' sympathies or prejudices.'" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014). However, we do not find that the prosecutor exceeded the latitude allowed—which includes the ability to use picturesque speech and make reasonable inferences—when these comments are considered in the context of the record as a whole. See *State v. Fisher*, 304 Kan. 242, 252, 254, 373 P.3d 781 (2016).

Here, the nickname of "Animal" was part of the identification process. Although the victim of the beating did not know Amaro, he overheard the other men calling him "Animal" during the attack. Likewise, each of the four witnesses who testified at trial identified Amaro's nickname "Animal" at some point during their testimony, including the witness called by the defense. Moreover, Amaro admitted to a law enforcement officer that his nickname was "Animal" even though he indicated he no longer liked the name. Accordingly, we conclude that the prosecutor's mention of Amaro's nickname when arguing to the jury was not improper, inflammatory, irrelevant, or prejudicial to his right to a fair trial by an impartial jury.

Next, Amaro argues that the prosecutor committed error by arguing facts that were not established by the evidence during closing arguments. Amaro also argues that the prosecutor misstated the law during closing arguments when he told the jury that none of the charges against Amaro involved consent. During closing arguments, the prosecutor must confine his or her remarks to matters in evidence. Moreover, the prosecutor's

15

comments must accurately reflect the evidence and controlling law. The prosecutor nevertheless has considerable latitude when discussing the evidence and may draw reasonable inferences from such evidence. *Fisher*, 304 Kan. at 252.

During closing arguments, the prosecutor stated:

"Testimony from Mr. Ruiz was clear in that Hector Amaro, as he refers to himself as Animal, was the leader of this attack. And you heard this morning the testimony from Detective Olson when he interviewed Hector Amaro, he didn't just admit to being a [Sureño]. He said, 'I'm the shock collar.' And when he's asked what a shock collar is, he said a shock collar is a person who sets the rules for the gang. So you have Julio Ruiz saying that the leader of this attack, the leader of this brutal attack on him on April 28th, was Hector Amaro. And you have Hector Amaro saying unsolicited, 'I'm the shock collar, I determine the rules.'"

A review of the record reveals that there was substantial evidence presented that Amaro was the leader of the attack on Ruiz and, as indicated above, that "Animal" was the nickname by which the other attackers referred to Amaro as Ruiz was being beaten. While no one testified at trial that they heard Amaro call himself "Animal," this was a reasonable inference drawn from the evidence by the prosecutor. If the other key participants in the attack knew Amaro's nickname, it was reasonable to infer that he may have also referred to himself as Animal. Regardless, for the reasons stated previously, we do not find this statement to rise to the level of prosecutorial error.

It does appear that the prosecutor misspoke when arguing about the term "shot caller" or "shock collar." We pause to note that although the transcript uses the term "shock collar," it was represented to us during oral argument that the term actually used was "shot caller." Regardless, there is evidence in the record to support the statement that Amaro admitted that he was the "shot caller" or the "shock caller" for his gang. However,

16

it was Detective Olson who testified that that this meant Amaro was a leader or someone who made the rules for the gang.

We do not find that the misattributed statement rises to the level of prosecutorial error under either the old or new framework. The district court instructed the jury that statements by counsel were not evidence and that any statements made by counsel that were not supported by evidence should be disregarded. As such, the jury knew that the prosecutor was presenting argument. Moreover, the jury had heard the testimony of Detective Olson regarding what Amaro had told him and heard Olsen's interpretation regarding what the term "shot caller" or "shock collar" meant. Furthermore, even if we found that the prosecutor's statement constituted error, we would find that any such error was harmless and did not prejudice Amaro's right to a fair trial.

Finally, Amaro argues that the prosecutor misstated the law when he told the jury that none of the five charges "involve consent, and you cannot consent to the beating. You cannot consent to the actions that took place on April 28th." Amaro argues that contrary to the prosecutor's statement, a person could consent to a taking or confining that would otherwise be a kidnapping. He maintains that if a person consents to confinement, it would not be accomplished by force, threat, or deception and, as such, would not be a kidnapping. Although that may be true, a review of the entire closing argument shows that the prosecutor was merely summing up the evidence and arguing that it showed there was no consent in this case. This statement was also not outside the latitude prosecutors are allowed in closing argument. However, even if the prosecutor's argument was erroneous, we do not find them to be gross and flagrant or made with ill will. See *Barber*, 302 Kan. at 380 ("Comments generally amount to gross and flagrant misconduct when they were repeated, emphasized, calculated, or in violation of well-established laws. . . . In analyzing ill will, this court considers whether the comments were 'deliberate or in apparent indifference to a court's ruling.'"). Finally, we find that there is not a reasonable possibility that the misstatements by the prosecutor contributed to the verdict in this case

17

or resulted in Amaro receiving an unfair trial. See *Fisher*, 304 Kan. at 255-56; *State v. Williams*, 299 Kan. 509, 541, 324 P.3d 1078 (2014).

*Sufficiency of Evidence*

Next, Amaro contends that the State failed to present sufficient evidence to support his conviction of aggravated intimidation of a witness because it did not show that the acts were done "with an intent to vex, annoy, harm or injure in any way another person" as required by K.S.A. 2016 Supp. 21-5909(a). When a criminal defendant challenges the sufficiency of the evidence, our standard of review is whether, after reviewing all the evidence in a light most favorable to the State, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Belt*, 305 Kan. 381, 397, 381 P.3d 473 (2016). In making this determination, we do not reweigh evidence, resolve conflicts in the evidence, or determine witness credibility. 305 Kan. at 397.

To convict a defendant of a crime, the State must prove each element of the crime beyond a reasonable doubt. *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016). Here, the State had to prove that (1) Amaro attempted to dissuade Ruiz from causing the arrest of any person in connection with the attack, (2) this act was done with the intent to vex, annoy, harm, or injure Ruiz, and (3) the act was accompanied by an express threat of force or violence against Ruiz. See K.S.A. 2016 Supp. 21-5909(a) and (b)(1). Although the words annoy, harm, and injure are common, the word "vex" is less common. It is defined in Black's Law Dictionary 1796 (10th ed. 2014) to mean "1. To harass, disquiet, or annoy. 2. To cause physical or emotional distress."

"A jury that has convicted a defendant is presumed to have believed the State's evidence and to have drawn from that evidence all inferences favorable to the State. [Citation omitted.]" *Raskie*, 293 Kan. at 920. Here, the State presented evidence at trial

18

that Amaro and several other men severely beat Ruiz. In addition, the evidence showed that Amaro told Ruiz during the attack that things would be 10 times worse if he "told on him." There was also evidence presented that during the attack Amaro told one of the other attackers "there was plenty of room left in the fields," which Ruiz believed meant that Amaro would kill him.

A reasonable factfinder could conclude based on this evidence that Amaro was attempting to dissuade Ruiz from causing his arrest in connection to the attack. Similarly, a reasonable factfinder could conclude that Amaro performed the acts on the night of the attack with the intent to annoy, to harass, to harm, to injure, and/or to cause emotional distress. Likewise, a reasonable factfinder could conclude that there was an express threat of force or violence against Ruiz. Accordingly, viewing the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found Amaro guilty beyond a reasonable doubt of aggravated intimidation of a witness.

*Cumulative Error*

Finally, Amaro contends that even if none of the alleged errors constitutes reversible on its own, the cumulative effect of the alleged errors denied him his constitutional right to a fair trial. When reviewing whether cumulative errors require reversal of a defendant's convictions, we must determine whether the totality of the circumstances establish that the cumulative errors substantially prejudiced the defendant and denied his or her right to a fair trial. *Holt*, 300 Kan. at 1007.

In determining if errors were harmless, we examine the errors alleged "in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." 300 Kan. at 1007. Cumulative error cannot exist if the defendant has

19

established only a single error. *Williams*, 299 Kan. at 566. Moreover, prejudicial error will not be found in circumstances where the evidence against the defendant is overwhelming. *Holt*, 300 Kan. at 1007.

For the reasons stated above, we do not find that Amaro has established any reversible error. Nevertheless, even if we found that there was more than one error in this case, we would find that such errors were harmless when viewed in the context of the record as a whole and the strength of the evidence presented at trial. Moreover, we do not find from the totality of the circumstances that Amaro's right to a fair trial was prejudiced. Thus, the alleged cumulative errors would not require reversal of Amaro's convictions.

Affirmed.