IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,550

STATE OF KANSAS,
*Appellee*,

v.

KASEY L. NESBITT,
*Appellant*.

SYLLABUS BY THE COURT

1.

The res gestae of a crime includes the acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence. Deaths caused within the time and circumstances of an underlying felony's res gestae qualify as felony murders. The focus is on whether the act causing the death occurred during the res gestae of the underlying felony; the death resulting from that act need not have occurred immediately.

2.

Evidence of felony murder is sufficient when testimony supports the State's theory that a victim's death 21 days after a rape was caused by blood clots that formed because of the victim's immobility, which, in turn, was precipitated by her pain from injuries suffered in the attack.

1

3.

A direct causal connection exists between the crime underlying felony murder and the death that follows from it unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death. An intervening event does not qualify as extraordinary if it was foreseeable.

4.

Sufficient evidence supports a defendant's conviction on felony murder, including the foreseeability of a rape victim's death 21 days after the attack, when injuries the victim suffered caused pain that immobilized her, giving rise to development of fatal blood clots.

5.

Sufficient evidence supports a defendant's conviction of aggravated burglary on the theory that he or she entered a dwelling, in which there was a human being, with intent to commit a sexually motivated crime therein when the jury heard testimony that, with the exception of a mutilated back door through which the attacker entered and a disorganized master bedroom where the rape occurred, the house was tidy and orderly; there were no signs of someone entering the house to commit theft, e.g., drawers and cabinets left open or their contents disturbed; neither responding officers nor crime scene investigators noticed anything missing or moved, and valuable items in open view were left behind by the attacker; and the victim was raped during the burglary.

6.

Comments from a prosecutor in closing arguments that inflame the passions or prejudices of a jury are prohibited. Such comments distract the jury from its mission to decide the case on the evidence and controlling law. A prosecutor's description of a 100-year-old victim as a "treasure" to her family is erroneous, but, in the context of this case, harmless.

7.

A race-switching exercise jury instruction, worded as suggested by the defendant in this case, is not legally appropriate in Kansas. Such an instruction tells jurors to deviate from their legal responsibility to disregard anything but the facts and the controlling law when arriving at their verdict in a case.

8.

Cumulative error may require reversal of a defendant's conviction if—under the totality of the circumstances—more than one error substantially prejudiced the defendant and denied the defendant the right to a fair trial. The doctrine of cumulative error does not apply when only one error has been detected.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed June 1, 2018. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, argued the cause, and *Samuel Schirer*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

3

The opinion of the court was delivered by

BEIER, J.: Defendant Kasey L. Nesbitt appeals his convictions for felony murder, rape, and aggravated burglary, arising from a violent and ultimately fatal attack on 100-year-old M.S. in her home.

Nesbitt raises five issues on appeal: (1) insufficient evidence to support felony murder; (2) insufficient evidence to support aggravated burglary; (3) prosecutorial error; (4) error in refusal to give a requested jury instruction on a race-switching exercise; and (5) cumulative error.

We reject these challenges and affirm Nesbitt's convictions.

FACTUAL AND PROCEDURAL HISTORY

The attack on M.S. came to light in the early morning hours of September 30, 2014, when she knocked on her neighbor's door. The neighbor's son answered the knock, finding a visibly "distressed" and "shaking" M.S. wrapped only in a bathrobe. M.S. said someone was breaking into her house. After letting M.S. inside and checking M.S.'s house for intruders, the son called police.

On arrival, officers of the Wichita Police Department also checked M.S.'s house for intruders. They found none but noted that the lock on the back door had been damaged and glass broken out. Although the master bedroom appeared disorganized, the officers did not notice anything obvious that had been disturbed or taken from the rest of the house. The officers interviewed M.S., noting that her right wrist was bruised and swollen. M.S. gave the officers her name, consented to a search of her home, and was taken to the hospital.

4

Crime scene investigators took photos of the back door of M.S.'s house, observing that the frame was lying on the ground in two pieces, surrounded by glass and sheetrock dust. Both of the door's strike plates had been knocked out, and one of them was lying on the floor. Like the officers before them, the investigators observed that the house was tidy and orderly, with the exception of the damage to the back door and some disarray in the master bedroom, where the attack had taken place.

The bedding in the master bedroom had been pulled back, and a pillow was lying on the floor next to the bed. As the crime scene investigators collected evidence, they saw jewelry; car keys; and a purse containing a wallet, medications, and cash in open view. They also did not detect "evidence that anything was moved" or missing in the rest of the house. Three items from outside M.S.'s house were collected and photographed:  a Dr. Pepper can in the alley behind it, a cigarette butt on its west side near the back door, and a switchblade in its backyard. Although the can and switchblade were tested for identifiable fingerprints, none were found.

A sexual assault nurse examiner (SANE) saw M.S. at the hospital and collected evidence. During the nurse's examination, M.S. could not be moved without causing her great pain. She also complained of severe pain while lying still. M.S. particularly cited great pain in her right arm, bottom, and back. The nurse made note of several injuries, including "extensive bruising beginning at [M.S.'s] head to her toes," indicating recent blunt force trauma. The nurse would later testify that M.S. had a fracture of her lower right arm that caused swelling.

The nurse also discovered substantial injuries to M.S.'s genital area. M.S. had a 5 millimeter by 5 millimeter abrasion on her labia minora, which, the nurse later testified, was associated with trauma. In addition, M.S. had bleeding under the tissue in the area

5

where she urinated. M.S. also had "a large hole" just below her vaginal opening. M.S.'s vagina was swabbed for evidence, and the swabs were turned over to police.

After the SANE exam was finished, M.S. was admitted to the hospital, where she told her attending physician that she had "generalized pain all over" and had an especially hard time walking because her "bottom [was] hurting all the time." Hospital caregivers also discovered M.S. had compression fractures in her lower spine, which were likely to be attributable to her attack and considered the likely source of her lower back pain. M.S. required a significant amount of help to move; pain from her injuries limited her ability to move herself. Doctors did not see improvement in M.S.'s mobility during her two-week hospital stay. Rather, they observed M.S. become weaker and suffer increasing trouble with mobility.

At the end of the two weeks, M.S. was transferred to a skilled nursing facility for physical therapy. She died 6 days later—approximately 21 days after the attack.

The coroner, Dr. Jamie Oeberst, would eventually confirm M.S.'s extensive bruising and the fractures noted by the hospital staff and the substantial reduction in her mobility that followed from the pain these injuries produced. According to Oeberst, M.S.'s reduced mobility ultimately contributed to the formation of blood clots in her legs, which traveled to M.S.'s lungs, killing her. Oeberst estimated that the clots had formed three to seven days before M.S.'s death. "[T]he clots in her legs that then went to her lungs is her cause of death. And the reason she developed those clots in her legs was because—was a result of the immobilization after the assault." Oeberst certified M.S.'s death as a homicide, with the attack, obesity, dementia, and advanced age contributing to her death. Oeberst acknowledged that it was possible, however, that the blood clots could have formed even if the attack on M.S. had not occurred.

M.S. was never able to give a complete description of the person who attacked her. She was able to say only that the attacker was a man. She told her daughter-in-law and a nurse, "I guess you could say I was raped," and, "[W]ell, I guess you could call it a rape." When a hospital psychiatrist asked M.S. if she knew why she was in the hospital, he testified, M.S. told him she was raped. But, at other times, M.S. said she did not know why she had been hospitalized. The psychiatrist diagnosed M.S. with dementia, primarily due to her advanced age.

Police did not have a suspect until DNA testing of M.S.'s SANE examination swabs revealed a local-and state-database match to a 2002 sample taken from Nesbitt because of another incident. Before M.S. died, the State charged Nesbitt with rape and aggravated burglary. It added a charge of felony murder after her death.

At trial, the State relied exclusively on its DNA match evidence to link Nesbitt to the crimes. Forensic scientist Sarah Geering testified that a major contributor and a minor contributor of DNA were found on the swab taken from M.S. The minor contributor's DNA profile was consistent with M.S.'s, leaving only the major contributor in the form of seminal fluid. Geering testified the lab was able to generate a "full profile at all of the markers that we test for." The major contributor's profile matched Nesbitt's. Given that match, the State did not arrange for DNA testing of the Dr. Pepper can, cigarette butt, and switchblade, or of a Walgreens receipt also found on M.S.'s property.

At the conclusion of the evidence at trial, Nesbitt requested that the district judge give the following "race switching" instruction to the jury:

"It is natural for human beings to make assumptions about the parties and witnesses in any case based on stereotypes. Often we may rely on stereotypes without even being aware that we are doing so. As a juror you must not make assumptions about

7

the parties and witnesses based on their membership in a particular racial group. You must not assume that a particular interpretation of a person's behavior is more or less likely because the individual belongs to a particular racial group. Reliance on stereotypes in deciding real causes is prohibited because every accused is entitled to equal protection of the law, and because racial stereotypes are historically, and notoriously, inaccurate when applied to any particular member of a race.

"To ensure that you have not made any unfair assessments based on racial stereo types, you should apply a race-switching instruction exercise to test whether stereotypes have affected your evaluation of the case. 'Race Switching,' involves imagining the same events, the same circumstances, the same people, but switching the races of the particular witnesses. For example if the accused is African-American and the accuser/victim is white, you should imagine a White accused and a black accuser/victim.

"If your evaluation of the case is different after engaging in race-switching, this suggests a subconscious reliance on stereotypes. You must then reevaluate the case from a neutral, unbiased perspective."

The State objected because the case against Nesbitt was primarily built upon DNA evidence, and the court denied Nesbitt's request.

During closing arguments, the prosecutor detailed the decline in M.S.'s quality of life after the attack. He then stated:

"The aggravated burglary, there are two counts. The first one set forth in instruction six. I believe the second one is instruction seven . . . . The bottom line is what we'd have to prove, you can read it for yourself . . . he *entered* the home without authority with the intent to—and there's two different ways to look at this, two alternative, either theft or a rape therein. And it happened on or about the date alleged." (Emphasis added.)

During the State's rebuttal, the prosecutor commented on M.S.'s relationship with other members of her family:

8

"Mr. Bennett described to you kind of this picture of [M.S.] in her house before the attack. A hundred-year-old family member appeared to be a gift to this family. They kind of treasured this kind of thing that they had. They had this older family member. She was happy. She was at home. And look at the change that occurs from that attack. Look how different that life became.

"The only mistake I would ask you to consider in this case is that [M.S.] did not get to live out her final days on her terms. The defendant took that away from her."

Defense counsel objected to this argument, asserting that these statements impermissibly asked the jury to "decide this case based on the sympathy for [M.S.'s] family." The district judged overruled the objection, not stating a rationale. The judge told the jury, both contemporaneously with the objection and as part of the instructions generally, that the statements made by counsel during closing arguments did not constitute evidence.

The jury found Nesbitt guilty of all three crimes. His aggravated burglary conviction was based on the alternative charge of entry into M.S.'s home with intent to commit rape. Nesbitt was sentenced to life without the possibility of parole for 25 years for the felony murder and consecutive imprisonment of 285 months for the rape and 34 months for the aggravated burglary.

DISCUSSION

*Sufficiency of the Evidence*

Our standard of review for a sufficiency of the evidence claim is a familiar one, often repeated:

9

> "When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014).

Nesbitt challenges the sufficiency of the evidence supporting two of his three convictions, felony murder and aggravated burglary.

*Felony Murder*

Nesbitt asserts two infirmities in the State's evidence of felony murder. First, he argues that M.S.'s death 21 days after the attack did not occur within the res gestae of the underlying felony of rape. Second, he argues there was no direct causal connection between the rape and M.S.'s death.

Felony murder is statutorily defined as the killing of a human being "in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2014 Supp. 21-5402(a)(2). Rape is an inherently dangerous felony. See K.S.A. 2014 Supp. 21-5402(c)(1)(E).

The res gestae of a crime includes the "acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence." *State v. Cameron*, 300 Kan. 384, 396, 329 P.3d 1158 (2014). Deaths "caused within the time and circumstances" of an underlying felony's res gestae qualify as felony murders. *State v. Brown*, 303 Kan. 995, Syl. ¶ 2, 368 P.3d 1101 (2016). "Generally, whether the underlying felony was abandoned or completed

10

before the murder is a question of fact for the jury to decide." *State v. Jackson*, 280 Kan. 541, 544, 124 P.3d 460 (2005).

> "Under the felony-murder rule, the killing may precede, coincide with, or follow the felony and still be considered as occurring in the perpetration of the felony offense, as long as there is a connection in time, place, and continuity of action. As long as the underlying felony and the killing are part of one continuous transaction, it is irrelevant for purposes of felony murder whether the felony took place before, after, or during the killing. In a felony murder, the killing need not occur in the midst of the commission of the felony, as long as that felony is not merely incidental to, or an afterthought to, the killing." 40 Am. Jur. 2d, Homicide § 68.

On similar challenges to the sufficiency of evidence to support felony murder in previous appeals, this court has focused on whether the *act* causing death occurred during the res gestae of the underlying felony; the *death* resulting from that act need not have occurred immediately. See *Brown*, 303 Kan. at 1003 (felony-murder conviction upheld when victim died at hospital, not during commission of underlying felony); *Cameron*, 300 Kan. at 386, 397 (felony-murder conviction upheld when victim died six hours after attack); *State v. Griffin*, 279 Kan. 634, 641, 654, 112 P.3d 862 (2005) (statute requires killing to occur during felony; victims died two and a half to three hours after underlying felony completed); see also *Matter of Anthony M.*, 63 N.Y.2d 270, 276, 284, 471 N.E.2d 447 (1984) (felony-murder conviction affirmed when victim died 10 days after underlying felony completed). Nesbitt's focus on whether M.S.'s *death* occurred during the res gestae reflects a misunderstanding of Kansas precedent and the concept of felony murder generally. He has directed us to no law supporting his interpretation, and we have found none.

The record contains abundant evidence conforming to the correct legal paradigm we have identified. It supports the jury's decision that the act causing M.S.'s death

11

occurred within the res gestae of the underlying felony of rape. The SANE testified that the attack severely injured M.S., including inflicting a "large hole" in her genital area. Other medical personnel told the jury about how M.S.'s health deteriorated significantly after the attack and continued to do so until her death. The coroner testified that the severe injuries sustained by M.S. led to the immobility that ultimately produced the clots that killed her. Nesbitt's res gestae-based argument is without merit.

Nesbitt also argues that evidence of "a direct causal connection between the felony and the homicide" is lacking. See *State v. Phillips*, 295 Kan. 929, 940, 287 P.3d 245 (2012). "[T]ime, distance, and the causal relationship between the underlying felony and the killing" are three factors used in determining whether there is a direct causal connection. 295 Kan. at 941. "A direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death." 295 Kan. at 941; see *State v. Beltz*, 305 Kan. 773, 778, 388 P.3d 93 (2017) ("Once it has been determined that the death lies within the res gestae of the underlying crime, . . . the direct causal connection can only be severed by an extraordinary intervening event.").

To determine if an intervening event is extraordinary, we consider whether it was foreseeable. See 305 Kan. at 774-75, 778-79 (upholding felony-murder conviction stemming from drug shootout; victim not intended target of robbery, shooting); *State v. Beach*, 275 Kan. 603, 613-14, 67 P.3d 121 (2003) (victim's death during drug transaction of third person foreseeable, supporting causal connection to convict defendant).

Nesbitt primarily argues on this point that seven logical "steps" were required to support conviction of Nesbitt on felony murder and, apparently, that their number exceeds the limit on an intervening event that can avoid the label of "extraordinary." He contends, "Since the State needed to prove direct causation—not simply 'but for'

12

causation—insufficient evidence supports Mr. Nesbitt's felony murder conviction." The asserted steps are:

"(1) that Mr. Nesbitt raped M.S.; (2) that the rape caused injuries; (3) that the injuries caused pain; (4) that the pain caused immobility; (5) that immobility and injuries caused blood clots to form in M.S.'s legs; (6) that the blood clots in M.S.'s legs caused blood clots to form in her lungs; and (7) that pulmonary blood clotting caused M.S.'s death."

Again, this argument by Nesbitt confuses the question. We must decide whether any event qualifies as an "extraordinary intervening" event that cuts off foreseeability of M.S.'s death. We are looking for something that supersedes the rape as the sole legal cause of M.S.'s death, not merely counting the foreseeable links in the causal chain.

Nesbitt's jury heard plenty of evidence supporting the continuing structural integrity of that chain. The coroner testified about the extensive injuries caused by the attack and said that resulting pain forced restriction of M.S.'s mobility, which was at the root of the fatal blood clots. The jury also heard ample testimony about M.S.'s steadily deteriorating health in the days leading up to her death. She never rallied and then backslid because of a new, unexpected development. Rather, her demise followed directly and inexorably from the violence inflicted upon her in the attack. This evidence was entirely sufficient to support causation.

To the extent Nesbitt advances a secondary causation challenge based on an inference that M.S.'s lack of mobility was a product of her personal choice rather than the dictate of excruciating pain, we have been directed to no evidence in the record before us to support that inference. However, even if such evidence existed, we would be compelled by our standard of review to mimic the jury in discounting it. On a criminal defendant's sufficiency challenge, we examine all of the evidence in the light most favorable to the State. See *Lloyd*, 299 Kan. at 632. If a rational factfinder could have

13

found the defendant guilty beyond a reasonable doubt, we affirm, without reweighing evidence or resolving evidentiary conflicts. 299 Kan. at 632.

*Aggravated Battery*

We move next to Nesbitt's challenge to the sufficiency of the evidence supporting his aggravated burglary conviction.

Aggravated burglary is defined under K.S.A. 2013 Supp. 21-5807(b)(1) as: "without authority, entering into or remaining within any building . . . in which there is a human being with intent to commit a felony, theft or sexually motivated crime therein." In the context of aggravated burglary, "entering into" means the "defendant crossed the plane of a building's exterior wall." *State v. Daws*, 303 Kan. 785, Syl. ¶ 1, 368 P.3d 1074 (2016). The necessary intent for conviction can be shown by circumstantial evidence. *State v. Killings*, 301 Kan. 214, Syl. ¶ 2, 340 P.3d 1186 (2015). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *State v. McCaslin,* 291 Kan. 697, Syl. ¶ 9, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014); see *State v. Thach*, 305 Kan. 72, 84, 378 P.3d 522 (2016) (circumstantial evidence adequate to support existence of necessary intent).

Nesbitt argues there was sufficient evidence to show the attacker *remained* within M.S.'s house with the intent to commit rape but insufficient evidence to show he *entered* the house with intent to commit rape. In Nesbitt's view, the evidence shows only that the intent to commit rape was present during the time the attacker was inside; the evidence supports a crime of opportunity but not one of design.

14

We reject Nesbitt's arguments. Nesbitt was charged with alternative counts of aggravated burglary:  one based on entering the house with the intent to commit theft and one based on entering with the intent to commit a sexually motivated crime. The jury found Nesbitt not guilty on the burglary charge based on theft and guilty on the burglary charge based on a sexually motivated crime. These conclusions were consistent with the trial evidence that, with the exception of the mutilated back door and disorganized master bedroom, the house was tidy and orderly. There were no signs of someone entering the house to commit theft, e.g., drawers and cabinets left open or their contents disturbed. Neither the responding officers nor crime scene investigators noticed anything missing or moved. In fact, valuable items in open view were left behind by the attacker. There was nearly irrefutable evidence that M.S. was raped. All of this evidence was sufficient to support the jury's logical inference that rape was the attacker's goal on *entering* M.S.'s home.

*Prosecutorial Error*

Our review of a claim of prosecutorial error in closing arguments requires a two-step process:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

> "In evaluating the prejudice step of our two-step analysis for reversible prosecutorial error, appellate courts shall look no further than, and shall exclusively apply, the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Prosecutorial error is

15

harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶¶ 7-8, 378 P.3d 1060 (2016).

Comments from a prosecutor in closing arguments that inflame the passions or prejudices of a jury are prohibited. *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011). Arguments that move "the jury's attention from its duty to decide the case on the evidence and controlling law" also are barred. 292 Kan. at 67.

Nesbitt contends that the State's rebuttal closing argument quoted in the factual and procedural background section above constituted prosecutorial error. He argues the reference to M.S. as a family "treasure" amounted to an improper attempt to inflame the passions of the jury.

Under this court's analysis of what was then termed "prosecutorial misconduct," which predated our decision in *Sherman*, 305 Kan. at 88, we consistently reprimanded prosecutors for making similar comments appealing to emotions of jurors. See *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014) (comment on victim's children no longer having a father improper appeal for sympathy); *Adams*, 292 Kan. at 67 (invoking sympathy for family of victim impermissible); *State v. Tosh,* 278 Kan. 83, 92, 91 P.3d 1204 (2004) (telling jurors to protect child victim from father by finding father guilty improper appeal to emotions), *overruled on other grounds by Sherman,* 305 Kan. 88; *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002) (prosecutorial error in closing argument: "[T]hink about Mother's Day yesterday, [how the victim's mother] must have felt. Now [the victim] will never have a chance to be a mother, this young professional sharp, security conscious woman.").

16

In keeping with our decisions in *Henry, Holt,* and *Adams*, we hold that the prosecutor's challenged remarks were error. They had no purpose other than inflaming the passions of jurors, distracting them from their task.

The next question is whether the error is reversible. Nesbitt asserts the prosecution's commentary in closing arguments had a reasonable possibility of affecting the outcome to his prejudice because the State relied so heavily on the DNA match to link him to the crimes. That evidence was not, he argues, overwhelming.

In deciding if a prosecutor's erroneous statement was harmless, this court looks primarily to "the impact of the error on the verdict," and "the strength of the evidence against the defendant" is only secondarily considered. *Sherman*, 305 Kan. at 111.

The State's rebuttal closing argument was, with this one exception, entirely appropriate. The prosecutor reviewed the evidence from multiple police officers, crime scene investigators, the coroner, hospital staff, and DNA lab staff. The prosecutor correctly summarized controlling law and how the jury should treat the evidence. We also note that the district judge, both contemporaneously with the objection and as part of the instructions generally, reminded the jury that the statements made by counsel in closing arguments were not evidence in themselves. Given the limited nature of the prosecutor's mistake, it would be unreasonable to believe that the comment caused reversible prejudice.

*Race-Switching Instruction*

Nesbitt argues that the district judge erred when he refused to give a novel proposed jury instruction.

17

This court uses a four-step analysis in reviewing jury instruction issues:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), cert. denied 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

A race-switching exercise instruction of the type sought tells jurors in a case in which the defendant and the victim are members of the same race to imagine the parties as members of a different race. If, by doing this exercise, jurors find that they would reach a different conclusion, then the instruction tells them that subconscious or implicit racial bias may be influencing their decision. It next tells the jurors to reevaluate the case from a neutral perspective. See Lee, *Race and Self-Defense: Toward A Normative Conception of Reasonableness*, 81 Minn. L. Rev. 367, 482 (1996).

Nesbitt points to no Kansas case in which the requested instruction has been given, and we have not found one. But several federal and state courts have addressed the issue of using specific jury instructions to address racial bias.

Under United States Supreme Court precedent, "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups." See *Rosales-Lopez v. United States*, 451 U.S. 182, 190, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion) (discussing juror prejudice in context of voir dire). Yet federal statutory law requires an instruction admonishing a jury not to consider race

in the sentencing phase of a capital murder case. See 18 U.S.C. § 3593(f) (2014). The federal instruction tells jurors not to take race, color, or religious beliefs into account in arriving at a recommendation on a death sentence. See 18 U.S.C. § 3593(f). Jurors must also sign a certificate affirming that they followed the instruction. See 18 U.S.C. § 3593(f). Again, this statute applies only during the sentencing phase of death penalty cases. See *United States v. Sampson*, 486 F.3d 13, 25 n.4 (1st Cir. 2007) (discussing district court's compliance with the required instruction, certificate process); *United States v. Davis,* 904 F. Supp. 554, 563 (E.D. La. 1995) (discussing statute's intent that instruction only to be used during sentencing phase, not guilt phase).

Outside the federal death penalty context, federal courts that have examined the issue of whether to give instructions that highlight possible racial prejudice have rejected them. See *United State v. Diaz-Arias*, 717 F.3d 1, 23-24 (1st Cir. 2013) (rejecting proposed instruction telling jury to disregard "any personal feelings you may have about the defendant's race or ethnicity, or national origin"; substantially covered in instruction given); *Jahagirdar v. United States*, 597 F. Supp. 2d 198, 204 (D. Mass. 2009) (requested racial bias instruction "might unnecessarily draw attention to the racial differences between the defendant and the alleged victim"); *United States v. Graham*, 680 Fed. Appx. 489, 492 (8th Cir. 2017) (unpublished opinion) (refusing to give instruction on implicit racial bias).

The majority of state courts addressing the issue have followed the same pattern. Some have reasoned that the instruction could inject racial bias into a proceeding where none existed before. *State v. Roseboro*, 351 N.C. 536, 555, 528 S.E.2d 1 (2000) (expressing such fear). Others have rejected such instructions because there had been no indication a jury's verdict reflected racial bias or simply because the instructions were not required. See *People v. Williams*, 1 Cal. 5th 1166, 1202-03, 384 P.3d 1162 (2016), *cert. denied* 137 S. Ct. 2301 (2017) (rejecting proposed jury instruction; "no indication [a

juror's] brief and isolated comment improperly factored into the jury's deliberations"); *People v. Smith*, 30 Cal. 4th 581, 639, 68 P.3d 302 (2003) (rejecting instruction; courts should "not interject the issue of race itself and then tell the jury to disregard it" without reason to believe jury would employ racial bias); *State v. Richardson*, 342 N.C. 772, 791-92, 467 S.E.2d 685 (1996) (rejecting proposed jury instruction because no requirement to give it).

It is notable that the Iowa Supreme Court came to a different conclusion in *State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017), holding that a failure to give a jury instruction to disregard race was error, albeit harmless.

In that case, the defendant requested the following instruction:

> "'Reach your verdict without discrimination. In reaching your verdict, you must not consider the defendant's race, color, religious beliefs, national origin, or sex. You are not to return a verdict for or against the defendant unless you would return the same verdict without regard to his race, color, religious belief, national origin, or sex.'" 898 N.W.2d at 816.

The Iowa trial judge had rejected the proposed instruction because it was not in the state bar association's model instructions, and the judge did not know of any precedent approving the instruction or commanding that it be given. The Iowa Supreme Court decided that the judge's legal analysis was erroneous, i.e., an abuse of discretion, because Iowa law permits these types of cautionary instructions, provided they correctly state the law. 898 N.W.2d at 816-17.

We do not decide today whether subconscious or implicit racial bias is as pervasive as it is pernicious wherever and in whomever it exists. We instead reject the instruction suggested by Nesbitt because it cannot be squared with Kansas law, and thus

the district judge's refusal to give it was not error. While the elimination of subconscious or implicit racial bias is a laudable goal, Kansas juries have a singular function: Deciding cases only on evidence actually and validly presented to them. They are not to imagine another set of facts and then allow that imagination to affect their deliberations.

We regularly chastise prosecutors for relying on facts not in evidence. See, e.g., *State v. Akins*, 298 Kan. 592, 601, 315 P.3d 868 (2014) (reprimanding prosecutor for referring to such facts); *State v. De La Torre*, 300 Kan. 591, 610, 331 P.3d 815 (2014) (prosecutor cannot create "imaginary script"). We cannot approve of telling jurors to do the opposite. See PIK Crim. 4th 50.040, 68.010 (jurors to disregard all but facts, law).

We also note, finally, that voir dire is available to both sides of a criminal jury case for ferreting out racial or other prejudice that should have no role in arrival at a verdict. Counsel may use their opportunity at that stage of the proceedings to encourage potential jurors to examine their consciences and their consciousnesses, including the possibility of the existence of implicit bias and its unjust effects.

*Cumulative Error*

Cumulative error may require reversal of a defendant's conviction if—under the totality of the circumstances—more than one error substantially prejudiced the defendant and denied the defendant the right to a fair trial. "Notably, cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. Furthermore, a single error cannot constitute cumulative error." *State v. Waller*, 299 Kan. 707, Syl. ¶ 4, 328 P.3d 1111 (2014).

We have held that only one error occurred. The doctrine of cumulative error is thus inapplicable to this appeal.

CONCLUSION

Defendant Nesbitt is not entitled to reversal of his convictions. The evidence supporting his felony murder and aggravated burglary convictions was sufficient. The prosecutor's single error during rebuttal closing argument was harmless. And the race-switching exercise instruction sought by Nesbitt was not legally appropriate. The judgment of the district court is affirmed.