NOT DESIGNATED FOR PUBLICATION

No. 119,164

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KIM P. VALENTINE,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; FAITH A.J. MAUGHAN, judge. Opinion filed May 31, 2019. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: The State brought Kim P. Valentine before a jury in the Sedgwick County District Court on charges of rape, aggravated criminal sodomy, aggravated battery, and domestic battery, in each instance allegedly committed against V.M.D. The jury found Valentine guilty of aggravated criminal sodomy and domestic battery, acquitted him on the aggravated battery charge, and failed to reach a unanimous verdict on the rape charge. This is Valentine's direct appeal of his aggravated criminal sodomy conviction.

1

FACTS AND PROCEDURAL BACKGROUND

V.M.D. testified that, at the time of the events that led to the charges, she had known Valentine for about two years and was involved in a romantic relationship with him. They lived together in a Wichita motel. By V.M.D.'s account of the events of April 25, 2017, she and Valentine were arguing in his car when he hit her in the face with a closed fist and she immediately felt her jaw break. She jumped out of the car with her seizure alert dog, but without her shoes, and tried to get away. As she tried to flee, Valentine got out, called her dog to him and picked it up, then caught up with her. V.M.D. swung her backpack at Valentine to get away from him. Valentine continued to hold V.M.D.'s dog in his arms and waved down a passing car. V.M.D. went across the street and asked someone to call 911.

Valentine presented testimony from witnesses who said Valentine stopped them as they were driving by on April 25 and asked them to call 911. They saw Valentine in an altercation with a woman and, before police arrived, they saw her repeatedly hitting herself in the face with a closed fist and scratching her arms. V.M.D. testified she was rubbing her face because it hurt, but she denied hitting herself in the mouth, cheeks, or jaw.

The police arrived and spoke with Valentine, then told V.M.D. that Valentine had promised to let her leave if she would go home and take her medication. After V.M.D. made her report to the police she went back to Valentine. She said although Valentine told the police he would let her leave, he then told her "[she] wasn't going anywhere," but she stayed to get her dog back. V.M.D. said Valentine would not let her leave, and she stayed with him at the motel until May 2.

Officer Kyle Mellard from the Wichita Police Department testified he responded to the 911 call on April 25. Mellard said that he and other officers concluded that

V.M.D.'s facial injuries from that night were self-inflicted and her claim that Valentine had broken her jaw was false.

V.M.D. told the jury that on May 1, she and Valentine had argued during the day after the "guys next door" asked her for a cigarette and Valentine accused her of sleeping with them. She said Valentine was drinking and continued to talk about his accusations the whole night. V.M.D. said she realized Valentine was drunk and she knew she might get hurt, as he got demanding and angrier and poured a bottle of whiskey over her head. At one point, Valentine told her to leave, but when V.M.D. got up to leave, he told her to lay back down or he was going to "knock the crap out of [her]." V.M.D. said she laid back down because she did not want to get hit.

When V.M.D. laid back down, Valentine demanded that she give him oral sex. He said he would give her to the count of five to do what he said, or else he was going to "kick [her] butt." V.M.D. testified she was afraid Valentine would hit her as he had before, so she complied with his demand. Nevertheless, Valentine was dissatisfied with what V.M.D. was doing; V.M.D. was crying and told him her mouth was hurting from the April 25 injury, but Valentine told her if she tried again to stop "he was going to knock the crap out of [her]." Eventually, V.M.D. told Valentine she had to stop because she couldn't breathe. Valentine then started hitting her in the face, head, chest, and body, turned her over, and forcefully penetrated her to have vaginal sex without her consent. V.M.D. said Valentine told her to call herself names like "whore."

Valentine eventually stopped because he was mad that V.M.D. wasn't "into it." He told her to start oral sex again, telling her again that "if [she] didn't do it he was going to knock the crap out of [her]." V.M.D. testified Valentine grabbed her head and pushed it down on his penis until she gagged numerous times and had trouble breathing. Valentine became angry that he did not reach orgasm and began hitting V.M.D. again.

3

V.M.D. tried to leave, but Valentine told her if she did, he would hurt her. He told her "if [she] was a police-calling bitch that . . . they would have to take [her] out in a body bag because [she] would be dead before they got there." V.M.D. stayed in the motel room until Valentine passed out. She then got dressed, washed the blood off her face, and left the motel room with only her dog and wallet. Once on the street, she waved down a police officer. She wanted to get to the hospital because her mouth hurt so much. She did not tell the first officer about the sexual assaults because she just wanted to get away.

Deputy Joseph Slaughter with the Sedgwick County Sheriff's Office testified that V.M.D. flagged him down around 1:30 a.m. on May 2, 2017. She told him her jaw hurt and she was worried that her boyfriend would find her. V.M.D. kept looking back to see if Valentine was walking down the street. She told Slaughter that her boyfriend had hit her several times, but she waited for him to pass out before sneaking out of their motel room. V.M.D. said "she didn't do what he wanted her to do." Slaughter called an ambulance, which took her to a hospital.

Dr. Daniel Gillespie, a radiologist who treated V.M.D. at the hospital, testified that when he examined CT images of V.M.D. on May 2, 2017, he saw two fairly new fractures of her jaw—one on each side. Dr. Gillespie said a patient with those fractures would typically have extreme pain. He had never heard of a person self-inflicting this type of injury and said that to be able to cause those fractures, someone would need "to be fairly strong, and very accurate." On cross-examination, Dr. Gillespie acknowledged he could not rule out the possibility of a self-inflicted fracturing of the jaw.

While at the hospital, V.M.D. recognized the police officer who showed up as the one she had seen in April. She felt he prejudged her, since he asked "if [she] had done this to [herself]." She did not tell him about the sexual assaults right away because she did not think he would listen. She told him she had been involved in a "bad sexual encounter." She then was taken to a different hospital where Amy Mitchell, a forensic

4

nurse, performed a sexual assault examination. Mitchell said V.M.D.'s injuries were consistent with her account that the oral and vaginal sex was nonconsensual. V.M.D. also reported no consensual intercourse within the past three days and that Valentine was the only assailant.

V.M.D. testified that after the examination she told a detective what had happened but said she did not want to press charges "[b]ecause nobody listens to me, they listen to him." V.M.D. left the hospital and went to a shelter. While there, she obtained a protection from abuse order against Valentine, alleging only that he broke her jaw during the incident on April 25, 2017.

On May 2, 2017, Officer Corey Masterson with the Wichita Police Department was dispatched at 3:41 a.m. to contact a suspect in a sexual assault at the Model Motel. The suspect was Valentine. During the initial contact, and before any officers suggested to Valentine that he was being investigated for a possible sexual assault, Valentine said, "'Fuck all the rape charge and all this shit.'" After being read his rights, Valentine made another comment about, "'I'm not arrested for some rape charge?'" Masterson then told Valentine about V.M.D.'s accusations, after which Valentine said they had sex on the previous day but had not had sex that day. Dana Loganbill, a forensic nurse, performed a sexual assault examination on Valentine on May 2.

Forensic scientist Sarah Geering examined the DNA swabs obtained during Valentine's and V.M.D.'s sexual assault examinations. She concluded that swabs from areas of Valentine's genitals indicated V.M.D. could not be excluded as contributing to the DNA profile she found.

After the State rested, Valentine moved for judgment of acquittal. The trial court denied the motion to acquit, finding that after viewing the evidence presented in the light most favorable to the State, there was sufficient evidence to support the charges.

5

At a jury instruction conference on the third day of trial, the district court reviewed the parties' proposed instructions. For the first element on the aggravated criminal sodomy instruction, the State asked the court to tell the jury that the State must prove Valentine "caused [V.M.D.] to engage in sodomy with *a person.*" (Emphasis added.) In contrast, Valentine asked that the instruction use the phrase: "[*t*]*he defendant* engaged in sodomy with [V.M.D.]" (Emphasis added.) Without objection from Valentine, the district court elected to instruct the jury on the aggravated criminal sodomy charge using the form requested by the State, with the first element obligating the State to prove Valentine "caused [V.M.D.] to engage in sodomy with a person."

The jury found Valentine guilty of aggravated criminal sodomy and domestic battery from the May 2 incidents and not guilty of aggravated battery on April 25. The jury failed to reach a unanimous verdict on the rape charge. The State later moved to dismiss that rape charge without prejudice because V.M.D. did not want to go through another trial.

The district court sentenced Valentine to the presumptive prison term of 272 months for the aggravated criminal sodomy conviction, consecutive to a 12-month jail sentence for the domestic battery conviction. Valentine timely appeals.

ANALYSIS

Valentine sets before us two alleged errors: first, that there was insufficient evidence to support his conviction for aggravated criminal sodomy; and second, that the Kansas Sentencing Guidelines Act (KSGA) relies on judicial findings concerning prior convictions to establish the presumptive sentence for a crime, contravening § 5 of the Kansas Constitution Bill of Rights.

6

*Valentine's aggravated criminal sodomy conviction*

Valentine's claim of insufficient evidence for the aggravated criminal sodomy conviction is not the type of "insufficiency" argument typically presented. He does not assert that the evidence failed to show he intentionally engaged in sodomy with V.M.D. when she did not consent under circumstances when she was overcome by force or fear in Sedgwick County on May 2, 2017. Instead, he relies on the fact that the first element in the district court's instruction for that crime said the State had to prove he "caused [V.M.D.] to engage in sodomy with a person," which he contends could only mean some person *other* than him. Since the State only presented evidence showing that he forced V.M.D. to engage in sodomy *with him*, he reasons the evidence was insufficient to prove the first element in the court's instruction.

In response, the State first points to the relevant language of that charge in the amended complaint, alleging that Valentine: "did then and there unlawfully engage in sodomy with [V.M.D.] or cause [V.M.D.] to engage in sodomy with any person or animal," contrary to K.S.A. 2016 Supp. 21-5504(b)(3)(A). The State contends the trial evidence showed Valentine twice forced V.M.D. to engage in sodomy with him.

*Standard of review*

As our Supreme Court recently observed:

"Our standard of review for a sufficiency of the evidence claim is a familiar one, often repeated:

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence,

7

resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Nesbitt*, 308 Kan. 45, 51, 417 P.3d 1058 (2018).

To the extent we are required to engage in interpretation of statutes, our review is de novo. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019).

*Discussion*

In both his briefs and his argument, Valentine endeavors to limit the scope of analysis to the sufficiency of the evidence to support a finding that he caused V.M.D. to engage in sodomy with someone else. He claims both *State v. Dickson*, 275 Kan. 683, 69 P.3d 549 (2003), and *State v. Fitzgerald*, 308 Kan. 659, 423 P.3d 497 (2018), provide support for his interpretation that "any person" in the sodomy statute means a person other than the defendant.

The State concedes there was no evidence showing the involvement of another person and focuses its initial argument on an analysis of *Dickson* and *Fitzgerald*. Alternatively, the State suggests that if there was error, it was error in the jury instruction and it did not rise to the level of clear error, which would be required because Valentine did not object to the district court giving that instruction. In reply to that argument, Valentine contends that instruction error is not an issue he raised or claimed as error, and the State invites error by this court when it asks us to consider that argument.

We do not decide issues that are not preserved and presented for our review. But Valentine attempts to move that boundary even further by restricting our analysis of the conviction he is challenging in his appeal and limiting us to an assessment of the sufficiency of the evidence for a crime that both parties agree did not happen. No one claims Valentine forced V.M.D. to engage in sodomy with some third person. And from the facts recited above, we find without any difficulty that the jury had amply sufficient

evidence upon which to base a finding that Valentine forced V.M.D. to engage in sodomy with him. While the issues asserted by an appellant do set the scope of appellate review, they do not dictate the analysis of those issues. Despite Valentine's attempt to cast it in a different light, the problem Valentine raises must be examined for error in the instruction.

The foundation of Valentine's argument is that the language in the instruction controls. He looks to *State v. Robinson*, 27 Kan. App. 2d 724, 8 P.3d 51 (2000), to support his contention that the State must "prove the particular crime defined in a jury's elements instruction." *Robinson* involved an aggravated robbery conviction for stealing a car while pointing a sawed-off shotgun at the car's owner. The district court instructed the jury that they must find proof that Robinson took the car "from the person" of the owner. The charging document likewise alleged the car was taken from "the person" of the owner, omitting any reference to the language in the statute about a taking from "the presence" of the owner. 27 Kan. App. 2d at 725, 727. The critical distinction between *Robinson* and the present case is that the State's amended complaint against Valentine included the full statutory language, charging that he "did then and there unlawfully engage in sodomy with [V.M.D.] or cause [V.M.D.] to engage in sodomy with any person or animal."

Neither do we find *Dickson* or *Fitzgerald* to be helpful or controlling here, because they present distinctly different scenarios from this case. In his appeal, Dickson conceded he engaged in sodomy with a child, but he asserted there had been no proof he caused a child to engage in sodomy with someone else or an animal. The two circumstances were the subject of separate subsections of the statute, at that time codified in K.S.A. 21-3505. Dickson had been charged under the subsection for causing a child to engage in sodomy with "any person or animal." *Dickson*, 275 Kan. at 686. The Supreme Court found "Dickson was charged with criminal sodomy under K.S.A. 21-3505(a)(3), whereas the evidence established a violation of K.S.A. 21-3505(a)(2)," and reversed that conviction. 275 Kan. at 695.

9

In *Fitzgerald*, the proof also departed from the charging document. The Supreme Court concisely summed up the issue:

> "The State charged Fitzgerald with aggravated criminal sodomy by 'feloniously [causing C.C.] (DOB: 02/21/2004), a child under 14 years of age, to engage in oral copulation with another person' in violation of K.S.A. 2017 Supp. 21-5504(b)(2) and (c)(3).
>
> "Although the State charged Fitzgerald with causing C.C. to engage in oral copulation 'with another person,' all parties thereafter proceeded with the case as though Fitzgerald had been charged with engaging in sodomy with C.C. himself." *Fitzgerald*, 308 Kan. at 660.

Without objection from either party, the first element of the district court's instruction said the State had to prove "[t]he defendant engaged in sodomy with [C.C.]." 308 Kan. at 662.

The Supreme Court discussed the discrepancy between what the State had charged and the evidence, instruction, and verdict, concluding that "we are compelled to reverse Fitzgerald's conviction as unsupported by sufficient evidence of the crime the State charged." 308 Kan. at 666. Contrary to the theory Valentine urges us to adopt, in *Fitzgerald* the State *did* prove the crime described in the instruction, but it was the charging document that controlled, not the instruction.

Both *Dickson* and *Fitzgerald* involved situations in which the defendant was charged with one means of committing the crime and all evidence pointed to another. Here, the State charged Valentine using the full statutory language, encompassing both a situation in which Valentine was the person engaging in nonconsensual sodomy and that in which he caused V.M.D. to engage in the act with another. The problem in Valentine's case is not that the evidence failed to prove the crime charged, as in *Dickson* and

10

*Fitzgerald*, but that the instruction chose the means from the complaint that did not match the evidence presented to the jury.

Our standard of review changes when presented with a question of error in a jury instruction:

> "When analyzing jury instruction issues, we follow a three-step process:
>
> "'(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless.'" [Citation omitted.] *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Since Valentine offered no objection to the district court's instruction on aggravated criminal sodomy, we find no error unless the instruction was clearly erroneous. See K.S.A. 2018 Supp. 22-3414(3). Next, "in determining whether an error actually occurred, we 'consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' [Citation omitted.]" 307 Kan. at 318. If error is found, and we reach the third step of the analysis, reversal is only warranted if we cannot find the error was harmless. An error is not harmless if we are "'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' [Citation omitted.]" 307 Kan. at 318.

The district court's instruction was legally appropriate for an instance of aggravated criminal sodomy when a defendant is charged with forcing a person, without consent, to engage in sodomy with someone other than the defendant. The instruction, however, was not factually appropriate, since all the evidence that the State presented addressed that part of the charge alleging Valentine forced V.M.D. to engage in sodomy *with him*. Thus, giving the instruction in the form used by the district court was error.

11

Finally, since there was error, we must decide whether it constituted clear error, requiring us to be "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." The State's evidence focused entirely on proving Valentine forced V.M.D. to engage in sodomy with him, without her consent. If the instruction error had not occurred, the district court would have written the first element to read: "The defendant engaged in sodomy with V.M.D." In view of the evidence, we are not persuaded the jury's verdict would have been any different if the correct instruction had been given. The error was harmless.

*KSGA and § 5 of Kansas Constitution Bill of Rights*

Valentine next argues the KSGA is "facially unconstitutional" because it provides for judicial determination of a defendant's criminal history, violating § 5 of the Kansas Constitution Bill of Rights. Valentine concedes that this argument has been rejected with respect to the United States Constitution. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Similarly, Valentine admits the Kansas Supreme Court has repeatedly rejected the argument that the KSGA violates the Sixth and Fourteenth Amendments to the United States Constitution. See *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002). Valentine concedes he did not raise this issue before the district court. We may consider it nonetheless, as it implicates a claim to the fundamental right of trial by a jury. See *State v. Beaman*, 295 Kan. 853, 858, 286 P.3d 876 (2012).

The sum of Valentine's "argument" on this issue is his assertion that:

"[P]rior to Kansas' statehood, American common law required any fact which increased the permissive penalty for a crime—*inclusive of an offender's prior criminal convictions*—to be proven to a jury beyond a reasonable doubt."

Valentine continues with a contingent conclusion:

"If this assertion is correct, it necessarily follows that the sentencing scheme set out by the KSGA—in which *judicial* findings of criminal history elevate a defendant's presumptive prison sentence—is unconstitutional."

In view of the Kansas Supreme Court's consistent rejection of the Sixth Amendment-based version of Valentine's current argument, it is incumbent on Valentine to provide authority showing our Supreme Court interprets—or would interpret—§ 5 of the Kansas Constitution Bill of Rights to require jury findings that the Sixth Amendment does not. He fails to do so. "This court is duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its previous position." *State v. Meyer*, 51 Kan. App. 2d 1066, 360 P.3d 467 (2015). Valentine's argument fails.

Affirmed.