NOT DESIGNATED FOR PUBLICATION

No. 127,349

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RANDALL J. SCOTT,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TYLER ROUSH, judge. Submitted without oral argument. Opinion filed March 6, 2026. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE and GARDNER, JJ.

PER CURIAM: Following a jury trial resulting in convictions for rape, attempted rape, aggravated burglary, and other offenses, Randall J. Scott appeals his convictions and sentence. He alleges insufficient evidence, jury instruction error, and two constitutional violations. Finding no reversible error, we affirm.

1

On August 10, 2021, the State charged Scott with several crimes for acts committed against his ex-girlfriend, B.R., on August 4, 5, and 6, 2021. In an amended complaint, the State specifically charged Scott with rape, attempted rape, aggravated criminal sodomy, aggravated kidnapping, attempted kidnapping, aggravated burglary, aggravated intimidation of a witness, criminal threat, aggravated domestic battery, and misdemeanor domestic battery.

This case proceeded to a five-day jury trial in December 2023. As outlined below, the State presented evidence of Scott committing sexual and physical violence against B.R. in her home, over a three-day period.

*Events on August 4*

At around 6 a.m. on August 4, 2021, B.R. received a call from Scott as she was driving home from a long work shift. Scott told B.R. that he was going to see his friend, Henry Jackson—also known as Bear—and asked B.R. to participate in a threesome with them. B.R. refused and went home to go to sleep.

Scott still decided to go to B.R.'s house. And while she was sleeping, he went into her room, removed his clothes, and got in her bed. He then tried to get B.R. to have sex with him. B.R. had seven children in the house and feared that Scott might become violent if she did not engage, so she began performing oral sex on Scott.

Unknown to B.R., Bear was also in her house at this time, hiding in the adjoining bathroom. According to Bear, Scott told him that B.R. wanted to have a threesome with them and directed him to hide in the bathroom for the first couple minutes. Scott held B.R.'s head down while she was still performing oral sex on him and then signaled to

Bear to join in. Bear complied, got behind B.R., and initiated vaginal intercourse without B.R.'s consent. B.R. could not say or do anything to stop this because Scott held her head down. Bear continued to rape B.R. for around 10 minutes. After he stopped, he left the bedroom. Scott then got on top of B.R. and also engaged in nonconsensual vaginal intercourse. After Scott eventually ended this encounter around 30 or 45 minutes later, both men left B.R.'s house.

*Events on August 5*

Scott returned to B.R.'s house the next day. He told B.R. to cook something for him, but she refused. She knew that Scott was aware that she did not consent to the encounter with Bear. When she mentioned something about the encounter, Scott became very angry. He accused B.R. of planning to "snitch" on Bear for raping her and then punched B.R. in the mouth. He started strangling her and also punched the back of her head several times. B.R. tried to escape to another room, but Scott followed her and continued to strangle her until she started to faint. Scott eventually stopped for a while, so B.R. got up and started making him something to eat.

Scott went to his car momentarily, but when he returned, he grabbed B.R. by her throat again. B.R.'s oldest foster daughter grabbed a frying pan and threw it at Scott. But Scott continued attacking and choking B.R., so the daughter bit Scott on his back to try to get him to stop. The bite left a mark, which was later documented. Eventually, B.R. managed to get free and ran outside.

B.R. started to run down the street, with Scott in pursuit. But she saw her children exit the house, so she went back. Scott grabbed B.R. again and told her to get in her car or he would kill her. B.R. was vomiting and struggling to breathe at this time. She agreed to get in the car but instead went toward her children to go inside the house. Then police

officers arrived. Someone in the house had dialed 911 two times during the chaos and hung up, so the officers did a safety check.

The officers saw someone, presumably Scott, running inside the house when they arrived. B.R. intercepted the officers as they reached her porch and shut the door to the house behind her. She denied that anything was wrong. The officers asked if they could check on the children but B.R. refused. She believed that this was the safest course of action because Scott had threatened to kill her and was inside the house with her children.

When the officers left, B.R. went back inside and told Scott to leave. Scott initially locked the door and blocked B.R. from leaving. But he eventually agreed to leave if B.R. paid him $100. So B.R. met Scott at an ATM to withdraw the money. After she handed the money over, Scott finally left for the night.

*Events on August 6*

Early the next morning, at around 5:30 a.m., Scott returned to B.R.'s house again. B.R. saw Scott on her Ring doorbell camera, he pulled his car up to the house, went to the front porch, and knocked on the door. B.R. could tell from looking at him that Scott was high at the time and told him to leave. While at the door, Scott vulgarly asked to have sex "one last time." B.R. told Scott no and stated that she was going to bed. She again told him to leave, but Scott did not comply. He rang the doorbell again and then forced his way into the house.

B.R. headed toward her room to call the police, but Scott followed her and took her phone. Scott locked B.R. in her bedroom with him and got into her bed, wanting sex. Scott removed his clothes and repeatedly tried to pull B.R.'s clothes off. He rubbed B.R.'s body, including her vagina and buttocks, with his penis. B.R. did not feel that she was free to leave the bedroom during this encounter and she never consented to any sexual

4

act. She repeatedly told Scott no. She also reminded him of "the situation [he] put [her] through with [Bear]." She also recalled that Scott had just beaten her. This enraged Scott again and he said that B.R. was going to snitch on Bear. B.R. indicated that this was not true, but Scott still punched her face and threatened to kill her. At some point, he also tried to break one of her fingers.

B.R. managed to get out of the bed and at that moment, her two oldest daughters picked open the lock on the bedroom door with a butter knife. B.R. was bleeding from her mouth and told her daughter to leave. Scott grabbed B.R.'s face to hide her lips and told the children that B.R. had just fallen off the bed. B.R.'s oldest daughter refused to leave, telling Scott she knew what he had done. She also tried to stand between B.R. and Scott, but Scott pushed her out of the way and threw B.R. onto the bed. B.R. got away from this momentarily and gave her daughter a hug, during which she whispered for her daughter to call the police.

As her daughter left the room, B.R. managed to follow. But Scott chased after her. He chased her outside and eventually caught her again. He took B.R. to the ground and choked her. As this continued, B.R. briefly lost consciousness.

A 911 operator received a call from one of B.R.'s daughters around this time, at around 6:18 a.m. The girl told the operator that her mother was being attacked. The operator stayed on the phone with the girl for around 15 minutes before B.R. took the phone. Through tears, B.R. told the operator that Scott tried to rape her and when she told him no, he punched her in the face.

*Scott's Arrest*

Officers from the Wichita Police Department eventually arrived in response to the 911 call. They approached cautiously and found B.R. crying and holding a hand towel to

5

her face. They cleared B.R. and the seven children from the home. B.R. told the officers that Scott had locked himself in the master bedroom and that there was a gun inside the house but not in Scott's possession. The officers swept the house and ultimately found Scott hiding in the bathroom without any clothes on. He was then taken into custody.

*Police Interviews*

B.R. talked with an officer at the scene following Scott's arrest. The officer recorded this discussion. B.R. also gave another recorded interview to detectives at the police department later that day.

Bear also submitted to several police interviews. Bear's defense counsel attended one of these interviews after Bear was arrested and charged criminally for his involvement in the rape on August 4.

*Medical Examinations*

B.R. underwent medical and sexual assault examinations. The examiners documented several injuries that B.R. sustained from these events. She had several vaginal injuries, wounds inside of her mouth, bruising all over her body, and petechial hemorrhaging that was consistent with strangulation. Scott's DNA was also found under her fingernails.

*Trial Testimony*

In addition to B.R.'s testimony, several officers, investigators, and medical professionals testified. Scott did not testify or present testimony from other witnesses.

6

As a part of an agreement with the State, Bear testified against Scott. Bear claimed that he did not intentionally rape B.R. Instead, Scott told him that B.R. wanted to participate in a threesome and coached him to hide in B.R.'s bathroom. After the incident was over, Bear suspected that B.R. had not given her consent. He testified that he eventually realized that he had actually raped B.R. He also told the jury that the purpose of his testimony was to put someone "behind bars" who he felt deserved it. He also insisted that he would have provided his testimony even if he had not been granted a plea deal in his criminal case.

*Verdict and Sentencing*

The jury acquitted Scott of several offenses, including aggravated criminal sodomy, aggravated kidnapping, attempted kidnapping, and aggravated intimidation of a witness. Still, the jury convicted Scott of rape, attempted rape, aggravated burglary, aggravated domestic battery, criminal threat, and domestic battery. The jury's verdict showed that the rape occurred on August 4; the aggravated domestic battery occurred on August 5; and the attempted rape, aggravated burglary, and domestic battery occurred on August 6. The jury also made a special finding that each crime was an act of domestic violence.

Scott moved for a judgment of acquittal, a new trial, and a departure sentence. The district court denied these motions and sentenced Scott to 409 months' imprisonment followed by lifetime postrelease supervision.

Scott timely appeals.

ANALYSIS

I.   *Does sufficient evidence support Scott's aggravated burglary conviction?*

Scott first argues that his aggravated burglary conviction must be reversed because it was logically impossible to prove the crime charged, as a person cannot intentionally commit an attempted crime. Scott's burglary was charged as aggravated based on the allegation that he had entered B.R.'s residence with the intent to commit an attempted rape. Scott argues that the State could not show that he committed the burglary with the specific intent to unsuccessfully rape B.R.

The State counters that this argument does not challenge the sufficiency of evidence supporting Scott's conviction but raises a flawed legal basis for reversing a conviction that is supported by ample evidence.

*Standard of Review & Basic Legal Principles*

When a defendant challenges the sufficiency of the evidence to support a criminal conviction, "we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). This standard requires appellate courts to affirm a conviction on sufficiency grounds when some evidence in the record supports each element of the offense. See *State v. Parker*, 309 Kan. 1, 13, 430 P.3d 975 (2018) ("To meet the sufficiency standard, evidence must support each element of a crime."). "It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

8

*Discussion*

The State charged Scott with aggravated burglary under K.S.A. 2021 Supp. 21-5807(b)(1). This statute criminalizes an unauthorized entering or remaining within an occupied dwelling, "with intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2021 Supp. 21-5807(b)(1). The State's complaint alleged that Scott entered B.R.'s residence with the intent to commit attempted rape. The jury instruction for aggravated burglary mirrored this language.

The corresponding instruction on attempted rape required the jury to find these elements:

"1. The defendant performed an overt act toward the commission of Rape.
"2. The defendant did so with the intent to commit Rape.
"3. The defendant failed to complete the commission of Rape.
"4. This act occurred on or about the 6th day of August, 2021."

Scott argues the State had to show that he had the specific intent to commit each of these elements, including that he failed to rape the victim. An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-5301(a). Attempt is a specific intent crime. *State v. Louis*, 305 Kan. 453, 460, 384 P.3d 1 (2016). Intent requires the accused to have a "conscious objective or desire to engage in the conduct or cause the result." K.S.A. 21-5202(h). Scott asserts that his conviction must be overruled because the jury could not have found that he intentionally failed to complete the rape. Quoting *State v. Jones*, 271 Kan. 201, 203, 21 P.3d 569 (2001), Scott insists that "'[a]ttempting to do something unintentionally is oxymoronic.'" K.S.A. 21-5301(b) states that it is not a defense "to a charge of attempt that the circumstances under which the act was performed or the means employed or the

9

act itself were such that the commission of the crime was not possible." Thus, factual impossibility is no defense. But Scott asserts legal impossibility here.

Our Supreme Court rejected an argument that a charged offense was an impermissible legal fiction in *State v. Gutierrez*, 285 Kan. 332, 172 P.3d 18 (2007). There, the State charged the defendant with attempted voluntary manslaughter. Gutierrez argued that the crime of attempted voluntary manslaughter based on sudden quarrel or heat of passion was an impermissible legal fiction because one could not intend to do an act that is defined by impulse and lack of reflection—lack of intent.

*Gutierrez* recognized that some charged offenses are logically impossible:

"In Kansas, . . . an attempt requires specific intent. Kansas does not recognize attempted felony murder, *State v. Robinson*, 256 Kan. 133, Syl. ¶ 1, 883 P.2d 764 (1994); attempted involuntary manslaughter, *State v. Gayden*, 259 Kan. 69, Syl. ¶ 2, 910 P.2d 826 (1996); *State v. Shannon*, 258 Kan. 425, Syl. ¶ 3, 905 P.2d 649 (1995); *State v. Collins*, 257 Kan. 408, Syl. ¶ 4, 893 P.2d 217 (1995); or unintentional but reckless second-degree murder under K.S.A. 21-3402(b); *State v. Clark*, 261 Kan. 460, 466-67, 931 P.2d 664 (1997); *Shannon*, 258 Kan. at 429. In other words, we have recognized in other circumstances that it is logically impossible to attempt to commit an unintentional act." 285 Kan. at 343-44.

*Gutierrez* found that voluntary manslaughter is a specific intent crime. Even so, *Gutierrez* rejected the legal impossibility argument, explaining that "if a defendant has formed the necessary intent, it is not logically impossible for him or her to attempt and fail to carry it out, that is, to engage in an overt act toward the accomplishment of an intentional crime." 285 Kan. at 344 (citing *State v. Graham*, 275 Kan. 831, 836-40, 69 P.3d 563 [2003]; *State v. Hedges*, 269 Kan. 895, 905-06, 8 P.3d 1259 [2000]).

10

The same logic applies here. Although "[a]ttempting to do something unintentionally is oxymoronic," *Jones*, 271 Kan. at 203, attempting to do something intentionally yet failing is quite possible. And the jury instructions correctly told the jury that the crime of attempt requires an overt act toward the commission of rape, done with the intent to commit Rape, but the defendant failed to complete the rape. Scott's claim that it is logically impossible to commit the crime of attempted rape fails.

Scott does not otherwise challenge the evidence as insufficient but concedes that the evidence proved that he intended to commit a rape, although he contends it could not legally have proved that he intended to commit an attempted rape. Scott thus waives the typical sufficiency of the evidence argument. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (An issue not briefed is deemed waived or abandoned.).

The evidence sufficiently supports Scott's conviction for aggravated burglary based on an underlying attempted rape.

II.    *Did the district court err in instructing the jury on attempted rape?*

Scott next claims that the district court erroneously instructed the jury that attempted rape is a strict liability offense when it is a specific intent crime. He claims that the instructions omitted an essential element of this offense, his mens rea, and thus violated his right to a fair trial under the Sixth Amendment to the United States Constitution, citing *Neder v. United States*, 527 U.S. 1, 12, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). He also claims that this error was not harmless and thus asks us to reverse his conviction for attempted rape on August 6.

11

*Standard of Review and Basic Legal Principles*

When a party alleges that an instruction should have been given, we first assess whether the instruction was legally and factually appropriate. *State v. Holley*, 313 Kan. 249, 254-55, 485 P.3d 614 (2021). If so, we also consider whether the instructions given properly and fairly stated the law and were not reasonably likely to mislead the jury. *State v. Dotson*, 319 Kan. 32, 51-52, 551 P.3d 1272 (2024). If we find error, we assess whether it requires us to reverse defendant's conviction. We generally use the applicable harmless-error test if the party requested the instruction at the district court—*Holley*, 313 Kan. at 256-57—and the clear-error test if they did not. See K.S.A. 22-3414(3); *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

But our Supreme Court recently held that a different standard applies when the challenged instruction omits an element of the charged crime in violation of the defendant's right to a jury trial under section 5 of the Kansas Constitution Bill of Rights. See *State v. Gleason*, 320 Kan. 726, 740, 571 P.3d 522 (2025) (finding section 5 preserves the jury trial right as it historically existed at common law when our State's Constitution came into existence in 1859; it declares, "'The right of trial by jury shall be inviolate.'"). Scott contends that *Gleason* applies here because the challenged instruction omits the element of intent. In such cases, the reviewing court must assume prejudice. But the State may rebut the presumption by showing that the defendant suffered no prejudice. 320 Kan. at 744-45.

Our Supreme Court decided *Gleason* after the parties filed their briefs. But Scott filed a Rule 6.09 letter addressing *Gleason* and arguing its standard applies here. To the extent that Scott attempts, by his 6.09 letter, to raise a new substantive issue about his section 5 right, as addressed in *Gleason*, he has waived or abandoned that issue, precluding appellate review. See *Davis*, 313 Kan. at 248 (issue not briefed is deemed waived or abandoned); *State v. Houston*, 289 Kan. 252, 277, 213 P.3d 728 (2009) ("Rule

12

6.09 was not intended to be, nor should it be, used as yet another briefing opportunity. The appellate courts will not consider those parts of a Rule 6.09 letter that fail to comply with the rule."). We thus limit our review to Scott's claim that the district court erroneously instructed the jury that attempted rape is a strict liability offense rather than a specific intent offense, violating his Sixth Amendment right to a fair trial.

*Legal Error*

Scott argues that by including the following language in the instruction for attempted rape, the district court effectively omitted the "intentional" element of attempted rape: "It is not a defense that the defendant did not know or have reason to know that B.R. did not consent to the sexual intercourse or was overcome by fear." See K.S.A. 21-5503(e). Scott contends that this language indicated to the jury that attempted rape is a strict liability offense rather than a specific-intent crime. Attempt is a specific-intent crime, and when the statute defining the intended crime does not include attempt as a means of violating that statute, K.S.A. 21-5301(a) functions as the default rule. The statute "requires the State to prove the defendant had the specific intent to commit the intended crime, even if that crime would not require specific intent as a completed crime." *State v. Mora*, 315 Kan. 537, 543, 509 P.3d 1201 (2022). See *State v. Maggard*, 26 Kan. App. 2d 888, 889-90, 995 P.2d 916 (2000).

The State concedes that the instruction was not legally appropriate, agreeing that K.S.A. 21-5503(e) erroneously renders rape a strict liability offense. But the State contends that the clear error test applies, rather than *Gleason*'s presumed prejudice test, and no clear error is shown.

We disagree with both parties. Having reviewed the challenged instructions, we find no legal error. The allegedly erroneous language—"It is not a defense that the defendant did not know or have reason to know that B.R. did not consent to the sexual

13

intercourse or was overcome by fear"—is taken verbatim from the rape statute, K.S.A. 21-5503(e). It speaks solely to the lack of Scott's defense, *not to any elements the State must prove or need not prove for rape or attempted rape,* so the instruction does nothing to suggest that attempted rape is a strict liability crime.

Our Supreme Court recently highlighted this distinction in rejecting a claim of arbitrary enforcement of the rape and sodomy statutes in *Ninh*:

> "To secure a conviction under either statute, the State must prove every element of the offense beyond a reasonable doubt. *State v. Brown*, 303 Kan. 995, 1001, 368 P.3d 1101 (2016). As the panel below noted, the elements of both 'statutes require the State to prove more than the accused merely engaged in sexual intercourse or sodomy with the victim'—the State must prove that 'the victim did "not consent to the" sexual intercourse or sodomy' and that the victim was '"overcome by force or fear."' *Ninh*, 63 Kan. App. 2d at 103-04; see K.S.A. 21-5503(a)(1)(A); K.S.A. 21-5504(b)(3)(A). The fact that the defendant cannot raise a particular defense does not relieve the State of its burden to prove these elements beyond a reasonable doubt. And executive and judicial actors cannot enforce these statutes against individuals just for engaging in sex or sodomy." *State v. Ninh*, 320 Kan. 477, 492, 570 P.3d 1169 (2025).

Nothing in the challenged instruction here invites the jury to find that the State need not prove every element of the offense, including the mens rea. Here, as in *Ninh*, the State had the burden to prove that the victim did "not consent to the sexual intercourse" and that the victim was "overcome by force or fear." See K.S.A. 21-5503(a)(1)(A). Whether defendant knew of any lack of consent, as addressed in K.S.A. 21-5503(e), is irrelevant to the State's burden of proof.

The instructions made clear to the jury that the State had the burden to prove all elements, including intent. Instruction No. 14, which charged Scott with attempted rape,

14

required the State to prove each of the following claims, including that "the defendant committed the crime intentionally":

"1. The defendant performed an overt act toward the commission of Rape.

"2. The defendant did so with the intent to commit Rape.

"3. The defendant failed to complete the commission of Rape.

"4. This act occurred on or about the 6th day of August, 2021, in Sedgwick County, Kansas.

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The State must prove that the defendant committed the crime intentionally. The defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

That jury instruction then listed the elements for a "completed crime of rape."

"The elements of the completed crime of rape are as follows:

"1. The defendant engaged in sexual intercourse with B.R.

"2. B.R. did not consent to sexual intercourse.

"3. The sexual intercourse occurred under circumstances when B.R. was overcome by fear.

"4. This act occurred on or about the 6th day of August, 2021, in Sedgwick County, Kansas."

This instruction, coupled with the others given to the jury, correctly informed the jury as to the law that governed its decision on Scott's guilt as to attempted rape on August 6. Finding no factual or legal error in the instructions, we need not decide which prejudice test applies here.

15

III.   *Did the district court err in instructing the jury on aggravated burglary?*

Scott also suggests that his aggravated burglary conviction should be reversed, apparently for the same reasons that his attempted rape conviction should be reversed. The State counters that Scott's aggravated burglary conviction is separate and that Scott fails to properly brief this argument. We agree with the State.

Scott makes this argument solely in a footnote, stating simply that this conviction should be reversed "because attempted rape was charged, and instructed upon, as an underlying felony" for the burglary offense. He also mentions the aggravated burglary conviction twice in arguing the attempted rape instruction, but he does not provide any separate analysis to support his request to reverse his aggravated burglary conviction.

In his reply, Scott acknowledges the State's argument that this claim is insufficiently briefed yet he neither explains this failure nor cites additional support for his claim. We find that Scott has thus waived or abandoned his argument challenging his aggravated burglary conviction on this basis, precluding appellate review of this claim. See *State v. Pewenofkit*, 307 Kan. 730, Syl. ¶ 2, 415 P.3d 398 (2018) (simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue; issues that are not properly briefed are considered waived or abandoned).

But even had this issue been properly briefed, it would fail for the same reasons addressed above because this claim of error, as best we can understand it, depends on Scott's success in overturning his attempted rape conviction.

16

IV.    *Is Kansas' rape statute unconstitutionally vague?*

Scott next argues that the statute defining rape, K.S.A. 21-5503, is facially unconstitutional because it makes subjective measures, including the victim's "fear" and "consent," elements of rape. He also claims the statute provides no objective measures for assessing an accused's guilt and thus fails to give fair notice of the conduct constituting these crimes and invites arbitrary enforcement. Lastly, Scott asserts that the 2010 recodification of the Kansas criminal code added language that makes rape a strict-liability offense, in violation of his right to due process.

After the parties briefed this issue, the Kansas Supreme Court decided *State v. Ford* and *State v. Ninh*, which resolve these issues. *Ford* and *Ninh* find K.S.A. 21-5503 facially constitutional, rejecting the same vagueness challenges that Scott raises here. These cases squarely address fair notice and arbitrary and unreasonable enforcement. *Ford*, 320 Kan. 507, 531-34, 571 P.3d 500 (2025); *Ninh*, 320 Kan. 477, 489-93, 570 P.3d 1169 (2025). And *Ninh* addresses Scott's more specific claim about "fear." 320 Kan. at 491-92.

The appellant in *Ninh* challenged the rape and aggravated criminal sodomy statutes as facially unconstitutional. He argued the statutes "allow for ad hoc and subjective enforcement" because they do not allow consent-based defenses. 320 Kan. at 492. Also, the statutes "allow a prosecutor to charge either crime 'knowing they do not have to prove the accused knowingly did anything other than have sex or sodomy.'" 320 Kan. at 492.

In rejecting the latter strict liability argument, our Supreme Court found that the statutes require the State to prove the victim's lack of consent to the sexual acts. See K.S.A. 21-5503(e) (rape); K.S.A. 21-5504(f) (criminal sodomy). "The fact that the defendant cannot raise a particular defense does not relieve the State of its burden to

prove [each of the offense's] elements beyond a reasonable doubt. And executive and judicial actors cannot enforce these statutes against individuals just for engaging in sex or sodomy." *Ninh*, 320 Kan. at 492. And in enacting the rape and criminal sodomy statutes, "the Legislature did not improperly delegate its exclusive power to define criminal conduct to other branches of government, contrary to separation-of-powers principles." 320 Kan. at 492-93.

Finally, like Scott, the appellant in *Ninh* argued that "the lack of a statutory definition, coupled with the subjective nature of 'fear' in the rape and aggravated criminal sodomy statutes, fail to give fair notice of the conduct constituting these crimes." 320 Kan. at 491. Relying on *State v. Cantrell*, 234 Kan. 426, 435, 673 P.2d 1147 (1983)—rejecting the same argument—*Ninh* summarily denied the claim. True, "'fear' as used in the rape and sodomy statutes was not meant to have an absolute definition because the concept of fear is subjective." *Ninh*, 320 Kan. at 491. But the analysis explained that "to accept [the] argument would require us to hold, as a matter of law, that a statute is unconstitutionally vague any time a statutory term requires a subjective evaluation." 320 Kan. at 490.

> "This is not the legal standard. Instead, we must determine whether, as applied to the facts in Ninh's case, the statutes prohibiting nonconsensual sexual acts 'when the victim is overcome by fear' provides a person of ordinary intelligence fair notice of the conduct prohibited. 'A statute is not invalid for vagueness or uncertainty where it uses words of commonly understood meaning.' *Hearn v. City of Overland Park*, 244 Kan. 638, 642, 772 P.2d 758 (1989)." 320 Kan. at 490.

Ninh concluded that a person of ordinary intelligence would understand what is meant by the words used in the rape statute and would have fair notice of the unlawful underlying conduct to avoid committing these crimes.

18

Scott filed a Rule 6.09 letter acknowledging these cases but contends they are wrongly decided. But as an intermediate appellate court, we are duty-bound to follow the controlling precedent of the Kansas Supreme Court, absent some indication the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). We thus reject Scott's claim that K.S.A. 21-5503 is facially unconstitutional.

V.    *Did the district court err by imposing a term of lifetime postrelease supervision without the jury finding Scott's age?*

Scott's final request for relief on appeal is for resentencing based on an alleged *Apprendi* violation. See *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). That case held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

Under K.S.A. 22-3717(d)(1)(G)(i), the district court must impose lifetime postrelease supervision when the defendant is at least 18 years old when he or she commits a sexually violent crime. But if the defendant was under 18 years old when the crime was committed, the postrelease supervision term is 60 months. K.S.A. 22-3717(d)(1)(G)(ii). Scott claims the district court violated the *Apprendi* rule by increasing his sentence to lifetime postrelease supervision without the jury having found that he was at least 18 years old when he committed the crimes, and without his knowing and voluntary waiver of that right.

*Preservation*

The general rule is that an appellate court does not consider issues raised for the first time on appeal, even those of a constitutional dimension. Yet an appellant may persuade the court to consider an issue raised for the first time on appeal by arguing the

19

application of one or more judicially recognized exceptions to the preservation rule. *Mendez*, 319 Kan. at 730. Scott acknowledges his failure to preserve this claim but contends that the issue may be decided as a purely legal question or to prevent the denial of a fundamental right. Still, appellate review remains prudential. 319 Kan. at 730-31.

We agree that this issue presents only a question of law on admitted facts. Appellate courts have often considered an *Apprendi* challenge for the first time on appeal. See *State v. King*, No. 127,569, 2025 WL 2682451, at *3 (Kan. App. 2025) (unpublished opinion) (listing cases considering unpreserved *Apprendi* claims). We choose to do so here, noting that the State has not objected to lack of preservation.

*Merits*

The State tacitly concedes that the jury's failure to find defendant's age was *Apprendi* error. We assume *Apprendi* error here and review the error for harmlessness. See *State v. Nunez*, 319 Kan. 351, 356, 554 P.3d 656 (2024) (finding that an *Apprendi* violation could be deemed harmless if the omitted element was uncontested and supported by overwhelming evidence); *State v. Sanders*, 65 Kan. App. 2d 236, 253, 563 P.3d 234 (2025) (citing *Nunez*, finding *Apprendi* error harmless when evidence of defendant's age is presented and undisputed); *State v. Duckworth*, No. 126,677, 2024 WL 4579265, at *5-6 (Kan. App. 2024) (unpublished opinion) (assuming *Apprendi* error occurred, it was harmless when defendant did not contest his age, it was easily provable, and he did not contend that his defense was related to his age), *rev. denied* 320 Kan. 864 (2025).

An error is harmless "if the reviewing court is convinced beyond a reasonable doubt the jury verdict would have been the same absent the error with regard to the omitted element, and that the omitted element was also uncontested and supported by overwhelming evidence." *Nunez*, 319 Kan. at 356. Emphasizing this rule, the State argues

20

that had the jury considered the question of Scott's age at the time of his crimes, it would no doubt have found Scott was at least 18. Among the evidence noted, the State points out that the jury saw Scott throughout the trial proceedings and the jury saw body camera footage of his arrest, which showed Scott completely nude.

We disagree that the jury's view of Scott during the trial was evidence. Our statute defines "evidence" as "the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals, and includes testimony in the form of opinion, and hearsay." K.S.A. 60-401(a). Jurors are to consider only the evidence admitted at trial. See generally PIK Crim. 4th 50.050 Consideration of Evidence (stating jurors should consider in their factfinding only matters admitted into evidence). "A matter which was not introduced or presented as evidence at trial does not come within the commonly accepted definition of evidence." 29 Am. Jur. 2d Evidence § 3 (2008). Thus physical objects seen by the jury are not evidence unless they are offered and admitted in a trial.

Still, we agree that the State convincingly shows that the evidence admitted at trial overwhelmingly proved Scott's age. See 319 Kan. at 356. Every conviction can be supported in whole or part by circumstantial evidence. *State v. Thatch*, 305 Kan. 72, 82, 378 P.3d 522 (2016). State's Exhibit 5, a video from a police body camera, showed the defendant nude. The victim referred to Scott as a "grown ass man" in her interview with detectives. When the victim's daughter called 911 to report Scott's assault, she told dispatch that Scott was age 40 or 41. And the medical chart of Scott's medical exam after his arrest reported Scott's age and date of birth, showing he was 40 at the time of his crimes in this case. No contrary evidence raised an inference that Scott was under age 18 at the time he committed his heinous acts. Scott's age as over 18 was thus uncontested and supported by overwhelming evidence. Convinced beyond a reasonable doubt that the jury verdict would have been the same absent the error, we affirm his sentence to lifetime postrelease supervision.

21

Affirmed.